In the Matter of the Probate of the Will of Jacob Stufflebeam, Deceased, Rachel Stufflebeam, Harvey Stufflebeam, and J. Y. Hazlett, Guardian *ad litem* for Frederick M. Stufflebeam, and William Ray-Stufflebeam, Proponents, v. Cinda Selensky, Elsie Renn, and Elizabeth Eveland, Contestants, Appellants.

**Wills:** undue influence: evidence. On an issue as to mental capacity and undue influence in the execution of a will the evi-

dence is reviewed and held insufficient to support a verdict setting the will aside.

*Appeal from Bremer District Court.*— HON. C. H. KELLEY, Judge.

WEDNESDAY, JULY 3, 1907.

WHAT purported to be the last will of Jacob Stufflebeam, deceased, was filed for probate August 20, 1904. The three daughters of deceased, Elsie Renn, Cinda Selensky, and Elizabeth Eveland, contest its admission to probate, on the grounds: (1) That deceased was not of sound mind when he executed it, and (2) that it was procured by undue influence exerted on him by Rachel Stufflebeam, his wife, and his son, Harvey M. Stufflebeam. The cause was submitted to the jury, and a verdict returned for contestants. Upon motion of proponents, the verdict was set aside, and a new trial ordered. The contestants appeal.— *Affirmed.*

*Sager & Sweet,* for appellants.

*J. Y. Hazlett* and *Gibson, Dawson & Fortner,* for appellees.

LADD, J.— Ordinarily, we should be content in saying that the ruling of the trial court in granting a new trial was discretionary, and therefore not to be disturbed; but the only grounds of the motion for new trial in this case are that the verdict is contrary to the evidence and the law, and the manifest purpose of the appeal from the order sustaining it is to have determined by this court whether the evidence was sufficient to sustain the verdict. It is not material to this inquiry that the court had previously declined to direct a verdict for the proponents, for it had the right to correct that ruling, if erroneous, by declining to allow the verdict for contestants to stand. The evidence disclosed that deceased was seventy years of age when he executed the will,

and that he died four years later.   It left all his personal property, save a bureau, to his son Harvey, and the use of one hundred and thirteen acres of land to his widow for life, and thereafter to Harvey for the rest of his life, with remainder to Harvey's children.   The bureau was given to Mrs. Renn.   The other two daughters are not mentioned in the instrument.   The daughters had remained at home and assisted their parents on the farm until married.   Neither at that time or subsequently had they received much from their father.   He was without education and signed papers by making his mark, though born in Illinois.   Shortly after coming to Bremer county, in 1873, he became afflicted with a fever sore on his leg.   This seems to have made him irritable, and he was sick frequently for several days at a time, and was attended by a physician.   In 1892, the leg was amputated.   Both before and after this he would often sit on the porch moodily with his face in his hands.   Of a somewhat jovial temperament when undisturbed, he was subject to violent fits of anger.   Thus, some fourteen years prior to the trial, Harvey and Renn, a son-in-law, were disputing about some colts escaping from a pasture, when Harvey called for his father, who came, and, without ascertaining what the trouble was about, or inquiring who was in the right, drew his knife, and threatened to kill Renn if he did not leave.   Thereafter he did not visit Mr. and Mrs. Renn for five or six years.   Their child died, and he did not attend the funeral.   Later, friendly relations were resumed and continued up to the time of his death.   After this trouble, he was about to relate the circumstances to another son-in-law, Selensky, when the latter remarked that he did not care to hear it.   Deceased became very angry, indulged in abusive language, and did not visit or speak to this son-in-law or wife for several years.

At another time, Eveland, another son-in-law, was having some dispute with Harvey, when the latter sent his boy for his father.   The latter, when he came, was exceedingly

angry, and threatened to kill Eveland, without inquiring con-
cerning the trouble.  Thereafter he had nothing to do with
this son-in-law and wife for several years.  Aside from this,
it appears that the deceased's wishes were often disregarded
and overruled by his wife and son, Harvey, and that he sub-
mitted.  For instance, Harvey broke a colt contrary to his
request.  Deceased wore a particular wooden leg to please
his wife, though another fitted him better.  He engaged a
man to haul logs, and thereafter had Harvey do so without
making any explanation for the change.  His wife usually
had her own way when there was any dispute about how the
work should be done.  In 1897, or 1898, becoming angry,
he seized a gander by the neck, and with an inquiry, "Will
you get in the garden any more ? " threw it in a nearby pond
killing it.  These are substantially all the circumstances
upon which the contestants rely as indicating insanity.  Sev-
eral witnesses testified, basing their opinions on some or all
of these circumstances that they thought him weak-minded or
insane.  But on cross-examination it developed that one wit-
ness merely thought him so when mad, and another consid-
ered the fact that he yielded to his wife and son was an
indication of insanity.

The only physician testifying for contestants, in answer
to a hypothetical question, answered that he " certainly was
not possessed of a good strong mind; what I should call a
strong mind.  Question: Was he of sound or unsound
mind ?  Answer: . I suppose that would be unsound if it
is not sound."  This amounted to no more than saying that
he was not of strong mind, a condition not essential to the
validity of the will.  Undoubtedly the deceased was a man
of irascible temper.  He gave way to his passions and car-
ried enmity against those with whom he quarreled for years.
The evidence of his quarrels with his sons-in-law shows that
he was inclined to take his son's part without question, and
possibly unwisely.  But an ignorant man is likely to be led
by impulse rather than by reason and judgment.  Nor was

his disposition to yield to the influence of his wife and son indicative of unsound mind. Conscious of his own limitations, he may have been excusable in putting greater reliance on the judgment of others. All of the circumstances relied upon as being inconsistent with sanity occurred long before the death of the deceased, and most of them many years prior to the execution of the will. His daughters resided in the neighborhood, and the fact that in their testimony, and that of the sons-in-law, no other circumstances inconsistent with sanity are related, strongly confirms the conclusion that his trouble with them was due to the defect of temper, rather than to impairment of the intellect.

True, he was illiterate and advanced in years, and had not enjoyed good health; but these facts do not indicate that he did not retain sufficient capacity to execute a will. If he bore grudges against his daughters without cause, and for long periods, it is to be said that the trouble with two of them and their husbands had been adjusted before the execution of the will. Moreover, some men forget more readily than others, and the fact that one does not forget or forgive quickly cannot be regarded, so long as human nature continues unchanged, as indicative of insanity. That he was often apparently in deep study, gazing on the ground, indicated no more than a habit not inconsistent with the possession of a sound mind. A careful examination of the record has led us to the conclusion that the circumstances related by the witnesses were not so inconsistent with sanity as to justify the opinion expressed by some of them that the deceased was of unsound mind. In behalf of the proponents, the evidence to the contrary is clear and convincing, and, while it is not the province of this court to weigh conflicting testimony, it is proper, in inquiring whether that of the contestants is sufficient to carry the case to the jury, to consider all the evidence in so far as it tended to explain that upon which the appellants rely.

Nor do we think there was any evidence of undue

influence. One Richie testified that Mrs. Stufflebeam was always in favor of Harvey having the property, and Harvey was not on good terms with the husbands of his sisters. Other evidence indicated that the deceased usually yielded to the wishes of his wife and son in business and other transactions; but these circumstance only indicate that he was susceptible to their influence. If he intended to give the daughters part of the land shortly before the will was executed, he must have changed his mind; but the record does not indicate how he came to make a will differing in terms from that intended. Indeed, the evidence, while it may support a suspicion that the will might have been the result of undue influence, utterly fails to show that any was exerted. It follows that the court might well have directed the jury to return a verdict for the proponents; but, having omitted to do so, it became its duty on motion to set aside the verdict returned for contestants as unsupported by the evidence, and order a new trial. The jury were undoubtedly impressed with the apparent unfairness of this will, owing to its inequality; but the law allows every man to dispose of his property according to his own notions of his obligation to those having claim on his bounty, and the courts will insist, as did the district court in this case, that, having done so, his property shall be distributed according to his directions.— *Affirmed.*