ALBERT PETERSON, as Administrator of the Estate of Anna Stina Lindquist, Appellant, v. OSCAR LINDQUIST, Respondent.

(169 N. W. 76.)

**Promissory notes — transfer of — by deceased person during last illness — suit by the administrator — to set aside transfer.**

The plaintiff brings suit as administrator of Stina Lindquist to set aside an alleged transfer to defendant of promissory notes and a mortgage for $2,000 and interest. The transfer, if made at all, was made by the deceased during her last sickness and about a month prior to her death.

**Transfer without consideration — except oral contract for care — during life — and to pay funeral expenses.**

a. It was made without any consideration, only an alleged oral contract to care for his mother during her life and to pay her funeral expenses.

**Obtained by fraud — undue influence — deceased feeble in mind — incompetent.**

b. It was obtained by fraud and undue influence, and when the mother was feeble-minded and incompetent and helpless, and in the power of the defendant.

**Promissory notes — transfer of — none in fact — no delivery of notes or mortgage.**

c. There was in fact no transfer of the notes and mortgage. The alleged transfer was not signed by the deceased, except possibly by her mark, and she never delivered to the defendant either the notes or the mortgage.

Opinion filed May 24, 1918. Rehearing denied September 24, 1918.

Appeal from the District Court of Mountrail County, Honorable *Frank Fisk*, Judge.

Plaintiff appeals.

Reversed.

*Fisk, Murphy, & Linde*, for appellant.

Where a son obtains the transfer of property to him, by his mother, who, at the time is sick and in an enfeebled condition mentally and physically, it is well settled that transactions of such a character will be most carefully scrutinized by a court of equity, and unless it is clear that such transaction is fair and free from undue influence, it will be set aside. Massey v. Rae, 18 N. D. 409; Gibson v. Hannag (Neb.) 88 N. W. 500; Davis v. Dean (Wis.) 26 N. W. 737.

Testimony to the effect that the mother assigned the notes and mortgage in question to the son, in consideration of his promise to care for her during lifetime and to pay funeral expenses, is clearly incompetent. Comp. Laws § 7871 and cases cited in note; Samson v. Samson (Iowa) 25 N. W. 233.

There is no competent proof of defendant's title by purchase. The only consideration was defendant's oral promise to care for his mother during her lifetime and to pay her funeral expenses, and that no other person was present except the defendant's wife. Defendant's wife was not called as a witness and defendant's testimony was wholly incompetent. Rogans v. Jones, 14 N. D. 591; Cardiff v. Marquise, 17 N. D. 110; Larson v. Larson, 19 N. D. 160, 23 L.R.A.(N.S.) 849; Wagenen v. Bonnot (N. J. Eq.) 18 L.R.A.(N.S.) 400, and note; Wall v. Wall, 45 L.R.A.(N.S.) 583.

Decedent retained the ownership, possession, and control of the papers until her death. There was no delivery and hence no executed contract of sale. 7 Cyc. 814, 815, and cases cited; 3 R. C. L. 967.

The transaction was not a gift. In order to constitute a gift either *inter vivos* or *causa mortis*, there must be an unconditional delivery of the subject of the gift. Luther v. Hunter, 7 N. D. 544; 12 R. C. L. 957 and cases cited; Comp. Laws, § 5541; Bishop v. Hassell, 107 U. S. 602, 27 L. ed. 500.

*James Johnson*, for respondent.

The deceased was the owner of the papers sold to her son, and she had a legal right to assign them to her son, or to any other person.

There was no fraud, or undue influence, exercised over her before she assigned the papers. The transaction was proposed by her, and carried out under her directions. Olson v. Olson, 150 N. W. 1070; McKillip v. Farmers St. Bank, 129 N. D. 541.

"Evidence must be clear and convincing of fraud or duress to justify setting aside the mortgage." Engbert v. Dale, 25 N. D. 587.

"It might be unfair and inequitable, but the law allows every person to dispose of his property according to his own notions of his obligations to those having claims on his bounty, and this court will insist, that, having done so, his property shall be distributed according to his directions." Stufflebean v. Selinsky, 112 N. W. 815; Allig v. Allig, 114 N. W. 1056; Nowlen v. Nowlen, 98 N. W. 388; Scofield Impl. Co. v. Minot Farmers Elev. Co. 31 N. D. 605, and cases cited; McLennan v. Plumber, 34 N. D. 269.

RobInson, J. The plaintiff brings suit as administrator of Stina Lindquist to set aside an alleged transfer to defendant of promissory notes and a mortgage for $2,000 and interest. The transfer, if made at all, was made by the deceased during her last sickness and about a month prior to her death:

a. It was made without any consideration only an alleged oral contract to care for his mother during her life and to pay her funeral expenses.

b. It was obtained by fraud and undue influence, and when the mother was feeble-minded and incompetent and helpless, and in the power of the defendant.

c. There was in fact no transfer of the notes and mortgage. The alleged transfer was not signed by the deceased, and she never delivered to the defendant either the notes or the mortgage.

No one can read and consider the evidence without coming to the conclusion that defendant was a bad and undutiful son, and that his testimony is worthy of no credit. He had two deceased brothers, John and Charlie. He managed to get all the estate of Charlie, and he did his best to get and to hold the estate of John.

To secure her rights the mother was forced to retain a lawyer and to incur expense and delay. She retained C. B. Miller, an attorney and member of Congress, of Duluth, Minnesota, and it took him three years

to force Oscar to put up for the estate which belonged to his mother. He testifies concerning Oscar: "He always spoke of his mother in a slighting manner and in a contemptuous way. When I mentioned the manner of his treatment of his mother, to reason him out of what seemed to be a plain and bold theft, he would grunt and sneer. When I undertook to help her, she was absolutely destitute because he had driven her out of the home that belonged to her, and was endeavoring to secure the property in North Dakota as well as in this state. There was no cordiality between them. Their relations were always at swords points. Of all the men that I have ever known, I have always considered his attitude towards his mother was the worst that had ever come to my attention, and I told him so in emphatic language. I know that Mr. and Mrs. Richards supplied Mrs. Lindquist for a long time and paid my expenses in connection with the case, including two trips to Grantsburg and two to North Dakota, and I know she made her home with them for a long time. I found that at no time did she sign her name by a mark. I had an awful fight with him over his account as administrator, and told him that I would have him indicted for it."

The testimony is in keeping with that of the sister, Lottie Richards, of Duluth. She testifies: "One day Oscar came to my house, and mother was there, and he asked her to settle up with him for her interest in the estate of John. Mother said, 'You will have to go and see my attorney,' and he threatened her and swore at her and called her names. He threatened her so much, my mother would not let my husband leave the house. He laid off from work until we got my younger brother Julius to stay with her in the daytime until Oscar left town. She was afraid of him."

A short time before the decease of the mother, Lottie, with her husband, went to visit the mother, and insisted that she should have a doctor. Oscar refused, and ordered them out of the house, and while they were in the house he gave them no chance to speak with the mother, and of course he said not a word to them about the transfer of the notes and mortgage.

The testimony fairly shows that Oscar has not the virtue of truth and honesty, so that what he says concerning a contract with his deceased mother has no probative force.

According to his story, his mother wanted to make a will in his favor. Then he told her it would do no good.

Q. What did you say?

A. I said, "Sign them over if it was to be any good." He said: I directed her that the assignment would be better than a will.

And so, when she was too weak to sign her name, too weak in body and in mind, he got her to touch her hand to the penholder while making a mark. But while she lived she retained possession of her notes and mortgage, and she never thought of turning them over to her cruel and dishonest son, who doubtless brought her to his house for the purpose of robbing her, and not to show her any kindness, not to secure for her medical treatment. It will bode ill for the cause of justice when such a transaction meets the sanction of any court.

It is true that the testimony of Erik Johnson, who filled out the assignment blank, is that she appeared quite rational and was able to sit up and to direct him to fill out the blank, but he was near to Oscar's house. He was a trader, and in giving his testimony he felt disposed to argue the case, and he volunteered to come from Wisconsin to this state to give his testimony. The chances are he did not do it for nothing. The testimony of the several witnesses residing at or near Palermo show that when the sick woman left for Wisconsin she was not competent to do business, and of course her mental and physical condition was not improved by the duration of her sickness and her approach to death. When she made her mark on the paper she was absolutely at the mercy of her cruel and dishonest son, who refused to permit her other children to converse with her. For him to insist on her making the transfer was to put her between the Devil and the deep sea. She was in no position to say no. It may be true that the helpless mother did freely and knowingly consent to do an unkind and unmotherly act by making the assignment and the marking, but the chances are it is not true.

It is impossible to determine the facts with any real certainty. We see not the wireless waves and the operation of electricity or of the mind, and yet we know there are times and conditions when a strong mind dominates and enforces a weak mind. We know that when the body is captive the mind is not free. In any view of the case to decide for the defendant would be to give sanction to a mean unconscionable act, while

to decide for the plaintiff is merely to permit the property of the deceased to go to her heirs as provided by the statute. The trial judge did not hear the witnesses. The testimony was all taken by deposition or before a referee.

It may be worthy of note, the deceased never delivered the notes or the mortgage to defendant. She kept them in her trunk until she died.

Oscar testifies: She got to his place November 15, 1912, made the assignment December 12, died February 2.

Q. The mortgage and notes were left in her trunk until she died?

A. Yes, I had seen them at Palermo.

Q. She never gave them to you?

A. No, she didn't.

Q. She kept them all the time?

A. Yes, she kept them.

Q. Until she died?

A. Yes.

It also appears that when he learned that she had proved up on a homestead of her son John near Palermo, he thought she might be worth looking up and went there to see her. He went to her shack near Palermo, remained with her an hour about noon, went back to Palermo and loafed around without going to bed until the next day about noon, when he took the train for home. And that was the first time he had seen his mother in seventeen years, except for an hour at Duluth when he cursed her and swore at her and threatened her.

Ordered that judgment be entered in favor of the plaintiff as demanded in the complaint.

Reversed and remanded.

BRUCE, Ch. J. (dissenting). This is an action which is prosecuted by an administrator to set aside the assignment of a certain mortgage, and to secure possession of the notes secured thereby. The plaintiff alleges the execution and delivery to the deceased of the notes and mortgage by one Larson, and that the same were the property of the deceased at the time of her death. The defendant, on the other hand, claims that the notes and mortgage were duly assigned to him in payment of services rendered and money expended, and in consideration of his promise

to care for the deceased during her life. The trial court found for the defendant, and the plaintiff appeals.

I can see no legal reason for reversing the judgment of the trial court. The only questions involved are whether there was a delivery, and whether fraud and undue influence were proved.

As far as fraud and undue influence are concerned, the plaintiff introduces no positive testimony, but inferences merely, and opposed to these inferences are not merely the positive denial of the defendant himself, but the positive testimony of the doctor, who last attended the deceased, of the two persons who witnessed the assignment of the mortgage, and the indorsement of the notes, and of the justice of the peace who acknowledged the assignment. These witnesses are, with the exception of the doctors, the only disinterested witnesses in the case. They testify that the assignment was willingly signed and without any fraud, compulsion, or duress, and that the deceased was in a proper mental condition to execute the same. Their testimony is also positive that the assignment was made for the purpose of paying the said Oscar for his services rendered and for his care of the deceased.

Though the doctor at Palermo testifies that before the deceased left Palermo she acted in an eccentric manner, he in no place testifies that she really lacked in legal capacity. The doctor in Wisconsin testifies that shortly before the execution of the instrument, although her vitality was not very good, he could see nothing unusual as far as her mental capacity was concerned.

There is, in short, in this case nothing on which to base any claim of duress or fraud, except the fact that until shortly before the assignment of the mortgage the plaintiff had taken but little interest in his mother. The testimony, however, shows that this was true of all of the children, and that this was no doubt due to the attitude of mind of the deceased herself. As far as I can learn, indeed, there are no equities in the case. Since the deceased left some other property, namely, her claim in North Dakota, and a house, there seems also to have been some provision for her remaining son and daughter.

The case, indeed, is a peculiar one. Throughout it seems to illustrate not the pleasant and usual simple and unselfish annals of the poor, but those which are sordid and selfish. The Lindquists were natives of Sweden. They emigrated to this country when Oscar was but a child, and

Oscar seems to have worked out from early boyhood. They settled at Trade Lake, Wisconsin, and lived there for a number of years. On or about October, 1907, John Lindquist, a son of Anna Stina Lindquist, took up a homestead in Mountrail county, North Dakota, and died before he perfected the proof. Thereafter his mother, the deceased Anna Stina Lindquist, came out to Mountrail county, and proved up on the claim, and the mortgage in question seems to have been obtained by her on the sale of this property. Later she herself took up a homestead north of Palermo and was living on it shortly before she was removed by the son Oscar to his home in Wisconsin, Oscar having been notified that she was sick and needed help. She had lived in North Dakota from 1907 to the fall of 1912, during which time Oscar seems to have visited her once, and the other children not at all, though the daughter appears to have sent her a little money. This daughter was married. One son was a lumberman in Wisconsin or Minnesota, and the others seem to have lived in Wisconsin. This neglect, however, seems to have been due largely to the deceased herself, as she seems to have evidenced but little affection for her children; and the fact that she proved up one quarter section for her son John, and took one for herself, shows her to have been possessed of an independent mind. At the time she was taken sick, one J. B. Hage notified her son Oscar Lindquist of the fact, and he immediately made preparations and came to Palermo, where he found her suffering with cancer, and took her home. It appears that it was necessary for him to borrow $100 for the purpose of making this trip. As soon as he had the business settled up he took her to his home in Trade Lake, Wisconsin, and after she had been there two or three days he called Dr. Albert Swanson, who told him he diagnosed the case as cancer of the stomach. According to Oscar's testimony, and this seems to have been corroborated by the testimony of the witnesses Eric H. Johnson and John E. Anderson, she told Oscar that she was pleased with the care she was getting and that she wanted to make a will in his favor. Oscar told her that he thought it wasn't right to take all, but if she wanted to it would be better if she assigned to him the certain notes and mortgage in controversy. A few days after this Oscar went over to Johnson's, and the latter and one Anderson went out to have the instrument executed. At about the same time a justice of the peace, Christensen, took the acknowledgment. This assignment was evidently given to Oscar either at

the time or soon after, and it was recorded within a few days. The notes were returned to the trunk from which they had been taken, but to which Oscar had access. It was, according to his testimony, agreed between him and his mother that he was to take care of her during her natural life, and this he did, and she stayed at his home until the 2d day of February, 1913. Much is made by counsel for appellant of the fact that Oscar did not send his mother for treatment to Rochester, Minnesota. If, however, we consider her advanced age, and the fact that a successful operation at such an age would be an impossibility, we see nothing peculiar about this. Much also is made of the fact that the defendant, Oscar, had been somewhat selfish in his dealing in the past, and had had some controversy with his mother and sisters over the estate of her son John, who had died some time since. The proceeds of this estate, however, had been given to his mother, and as there seems to have been no love lost between the members of the family generally, the fact is not controlling. It showed a selfish man, but it was not sufficient to overcome the positive testimony of the witnesses Eric H. Johnson and John E. Anderson, that the assignment was executed willingly and without fraud; nor is there anything in the testimony, save in reflections upon the character for generosity of the defendant, which negatives his testimony as to what occurred. It is also to be remembered that the assignment was acknowledged on the 21st of December, 1912, before O. T. Christensen, a justice of the peace, and this acknowledgment must be given some weight.

Though, indeed, it is unquestionably the law that transfers of this kind should be carefully scrutinized by the courts of equity, I find no proof of undue influence in the case which is before us. I see no reason, indeed, why the deceased should have been solicitous for the welfare of her other children, and, as I have said before, some property was left for them.

It is also maintained that a gift obtained by a child from a parent, to whom he stands in a confidential relation, is prima facie void, and the burden of proof is on the donee to show that it was a free unbiased act of the donor. This, undoubtedly, is the law; but not only has the burden of proof been met, but the proof tends to show that the transfer was for a valid consideration, namely, money expended, care bestowed, and the promise to take care of the deceased during the remainder of her life.

See McKillip v. Farmers State Bank, 29 N. D. 541, 151 N. W. 287, Ann. Cas. 1917C, 993; Stufflebeam v. Sellensky, 135 Iowa, 338, 112 N. W. 815; Altig v. Altig, 137 Iowa, 420, 114 N. W. 1056.

Nor is there any merit in the contention that no delivery is proved. The evidence shows that the assignment was recorded by the defendant a short time after it was made. He testifies that it was given to him. He also testifies that he was told that he could take the notes from the trunk whenever he desired. They were in his possession at the time of the trial, and prior thereto. There is certainly a presumption of due delivery, and this presumption has not been overcome. Hall v. Cardell, 111 Iowa, 206, 82 N. W. 503; Cecil v. Beaver, 28 Iowa, 241, 4 Am. Rep. 174; Nowlen v. Nowlen, 122 Iowa, 541, 98 N. W. 383.

It is to be noted that at the time the assignment of the mortgage was made the notes were also indorsed by the deceased, and the indorsement was witnessed by the same parties that witnessed the assignment of the mortgage.

No point can be made on the ground that part of the testimony of the defendant, Oscar Lindquist, involved a transaction with a deceased person, as this testimony was either elicited from the witness by the plaintiff himself, or, if given on cross-examination, was not objected to.

I am of the opinion that the judgment of the District Court should be affirmed.