## IN RE WILL OF BYRNE.

### MARY BYRNE, Appellant, v. JAMES BYRNE et al., Appellees.

WILLS: Testamentary Capacity—Evidence—Disinheritance of Children. That a father has disinherited his children is not sufficient, alone, for a finding of mental incapacity, although, if there be other evidence raising reasonable question of his testamentary capacity, such refusal to recognize the claims of his family may fairly be considered upon the merits of such an issue.

WILLS: Testamentary Capacity—Sufficiency of Evidence. Evidence reviewed, and held sufficient to establish testamentary capacity of testator.

WILLS: Testamentary Capacity—Mental Decay—Intelligent Comprehension of Devised Estate. The law recognizes no degree of

mental decay as sufficient to deprive a person of testamentary capacity which does not deprive him of intelligent comprehension of the estate he is devising, or of his capacity to appreciate the nature and effect of the distribution he makes of his estate. His memory may be impaired, he may lack the mental qualities or alertness of youth, and may not be able to transact business generally or to enter into complicated contracts, and still may be able to make a valid will.

**TRIAL:** Instructions—Opinion Evidence—Error. An instruction that a state of mental unsoundness may exist in a person which would render him incompetent to make a will, notwithstanding his apparent sanity to those with whom he came in contact, and who were not experts upon the subject of insanity, is objectionable, in that the jury would be likely to understand therefrom that, even if all the nonexpert witnesses coming into contact with the testator in a business or social way should unite in the opinion that he was of sane and sound mind, yet such an opinion must yield to that of experts.

**WILLS:** Validity—Testamentary Capacity—Instruction — Unsoundness of Mind. The instruction that any impairment of the mental faculties which creates unsoundness of mind disqualifies a person from making a will, even though he has not reached a state of absolute insanity or imbecility, is objectionable, in that it is misleading, and in that a jury of laymen, especially if at all sympathetically inclined against the will, might come to the conclusion that even a slight impairment is all that is necessary to sustain a finding of testamentary incapacity.

*Appeal from Pocahontas District Court.*—JAMES DELAND, Judge.

MAY 21, 1919.

MATTHEW Byrne was twice married. He died, leaving him surviving several children of his first marriage, and the wife and two children of his second marriage. By his will he provided a life support of $25 per month for one child of his first marriage, and a legacy of $15 each to the other children of that union. Subject to these gifts, and the payment of his debts, his entire estate was bequeathed and devised to his widow and the two sons of the last mar-

riage. The will being offered for probate, the children of
the first marriage, except two, unite in contesting its validi-
ty. There was a verdict and judgment for the contestants,
and the proponent appeals. The sole ground of contest sub-
mitted to the jury was the alleged mental incapacity of the
testator.—*Reversed and remanded.*

*Price & Burnquist* and *Lynch & Hogan,* for appellant.

*Healy & Faville,* for appellee.

WEAVER, J.—The will in question was executed March
1, 1913, and the testator died January 29, 1917, at the age
of 70 years. The contestants allege, and the jury found,
that, at the date of said instrument, Matthew Byrne was
of unsound mind, to an extent rendering him incapable of
making an intelligent disposition of his estate. The evi-
dence offered in support of this claim involves, to a large
extent, the story of this man's life in its entirety. Many
alleged incidents relating to his acts, words, and conduct
during the period of 40 years or more preceding his death
are testified to with particularity by witnesses, and pressed
upon our attention by counsel, as justifying the verdict
and judgment below. The volume of such evidence is quite
large, and we cannot attempt its restatement in this opin-
ion with any degree of fullness; but, having reached a con-
clusion at variance with the views of the trial court, we
recite enough of the showing to make plain the grounds up-
on which we think a reversal is made necessary.

I. Byrne was a native of Ireland, who came to Ameri-
ca while still a boy, and, except a period of four years here-
inafter referred to, lived practically all the remainder of his
life at or near the town of Fonda, in Pocahontas County
in this state. While still a young man, he married. The
wife of that union died about the year 1887, having borne
him ten children, who survived her. In 1894, he married
the proponent of this will, by whom he had two children,

and with whom he lived until his death. At his decease, nine of the children of the first marriage and the two of his second marriage survived him. He was a farmer and an active cattle dealer, and had bought and sold several different tracts of land. At his death, he was owner of a farm of 240 acres, and (as we understand the record) a house and lot in town. He left very little personal estate, and his indebtedness aggregated about $5,000. He never at any time until his death relinquished the personal management of his property and business. The children of the first marriage, except Matthias, left home at or before arriving at their majority, and thereafter made very few visits to their father. Since his death, the son Parnell has died. The remainder of the children of that marriage, except Matthias and Margaret, appear among the contestants, and testify as witnesses in their own behalf.

The testimony of these children, upon which much stress is laid in argument by their counsel, relates almost exclusively to the alleged tyrannical and cruel treatment which they suffered at the hands of their father, while still members of the family home. For example, the oldest daughter, Katherine, testified to seeing her father strike her brothers and sisters with buggy whips or cattle whips, for what she describes as slight or trivial faults; that she saw him put the children to bed with a whip; that he would sometimes strip them naked and whip them. She says the "main thing was that the boys would not do their work to suit him," and that, in at least two instances after such whippings, she "saw their bodies would be bleeding." During the lifetime of her mother, she remembers occasions when her father would be whipping some of them, and her mother stepped in "between him and the children, to protect them," and that, on such occasions, he struck her also. She says she never saw him offer any violence to her mother except when she interfered to protect her children.

The witness says her father also sometimes would kick his horses, or "strike them with the neckyoke, or things of that kind." He was not intemperate, she says, but he was profane and abusive in language.

After reciting these and other similar occurrences, the witness was interrogated as follows:

"Q. I want you to tell the jury what your judgment and opinion is, and I want you to base your judgment and opinion solely and exclusively upon what you saw your father do, what you heard him say, his appearance and conduct, all of which you have related here in your testimony to the jury this morning, whether or not, in the year 1897, your father was a person of sound or unsound mind? (Mr. Price: We object to that as incompetent, irrelevant, and immaterial. Overruled. Proponents except.) A. Unsound."

On cross-examination, this witness admits that she herself might have whipped some of the children,—her brothers and sisters,—but expresses her opinion that some of them deserved the punishments given them by her father, and again concedes that "sometimes there was some justification and excuse; there were times when he whipped me, he might have been justified. I cannot say as to whether or not his punishments of the other girls was justified. * * * Father frequently sold cattle in Chicago. He occasionally bought me and other members of the family gifts. He bought me a gold watch in my childhood."

The son Thomas testified to much the same story of the frequency and severity of the whippings administered by his father to the older children, and to his hitting the witnesses' mother once or twice, when she came between him and the children. He also developed the fact that the deceased possessed a revolver, which he sometimes carried, and that, on one occasion, he became involved in an affray with one Griffin, in which he shot and wounded the latter,

and that, upon trial for the alleged felonious assault so committed, he was acquitted. Thomas and another one or two of the witnesses also say that their father complained, on one or more occasions, of having been followed by some unknown person in the nighttime, and that once, someone tried to stop his team; but neither witness had any knowledge whether these things were or were not true.

After stating these incidents, this witness was asked the same question we have above quoted from the examination of his sister Katherine, concerning his opinion whether Matthew Byrne was of sound mind during the last 20 years of his life, and answered, "Unsound mind." On cross-examination, he emphasized this expression by declaring, "I knew my father was a raving maniac."

Another son, James, corroborates the story of Thomas and Katherine to some extent, but says he never saw his father whip either Parnell or Matthias or Lizzie.

"Saw father cruelly beat his horses. Saw him strike mother once or twice. After mother died, father used to cry almost all night long. That continued eight or ten months. It continued even after he began to wait on other women."

Basing his opinion on the facts related by him, he also declares that his father was of unsound mind as far back as he can remember him. This witness had not visited or seen his father after some date in the year 1911.

The daughters Mary and Lizzie testify to the story of whippings by their father, but with materially less particularity than is indulged in by the witnesses already mentioned. Mary unites in the opinion that the testator was of unsound mind, but Lizzie expresses no opinion on that subject. Margaret does not testify, and does not join in the contest.

The contestants also called the proponent as a witness in their behalf, with the apparent purpose of drawing from

her testimony of some kind which would tend to support their charge of undue influence. If this was the purpose, it does not seem to have been successful, and, in so far as it has any bearing on the issue of mental unsoundness, it tends rather to negative their claim; and such reference as we care to make to the matter of her testimony will be reserved, for the present.

The foregoing, we think, sufficiently states, in substance, the entire case, as made by the testimony of the family in support of the contest. In addition to the family witnesses, certain non-expert neighbors and acquaintances were called by the contestants, as were also one or two physicians. It appeared that, about March 1, 1916, three years after the will was executed, the testator went to Dubuque, and entered the Sisters' Hospital at that place for treatment, and remained there some six or eight weeks. His son Matthias, to whom reference has already been made, had become a helpless invalid, if not hopelessly imbecile, and was then already an inmate of that institution.

The postmaster at Fonda, an old acquaintance and neighbor, went with Byrne to Dubuque, and, being called as a witness by the contestants, says that, on the trip, Byrne talked with the members of the party. The witness noticed his appearance, manner of talking, and facial expression, and saw nothing peculiar, to attract his attention, except that he was a little nervous. His conversation was coherent; he knew what he was talking about; he knew the doctor's name, and recognized the hospital. The same witness saw and talked with him again, after his return home from the hospital, and still saw nothing unusual in him.

Of other witnesses for the contestants, we may mention the following: One Ellis, an old neighbor, says he saw him on the street quite often, about the time he went to Dubuque, and sometimes he passed without speaking, or returning offered greetings; but the witness frankly adds,

"He was a peculiar man that way. Never seemed to warm up to me at any time." Tiedman simply saw him once in the street, bareheaded, and with slippers on his feet, and saw Dr. Whitney following him or accompanying him. He went about six blocks to the railroad station, and then back home. One Sauter recalls an incident of 22 years ago, when he heard Byrne and his son Thomas have some sharp words over the tardiness of the boy in getting to his work. One Ellis remembers that, 18 years ago, he saw one of the Byrne boys engaged in hitching up a team; and, as he stooped over to pick up the neckyoke, his father "hit him across the back with a rope." One Witcraft went to the home of the Byrnes while Matthias was still there, in a physically helpless condition, and while in the sick room, in company with Byrne, he heard Matthias indulge in vile and abusive language toward his father and stepmother, accusing them of neglecting and starving him. Mr. Byrne said to the witness that he had done all he could for his son, and said he was going to see Dr. Whitney, and try to have him sent to a hospital. At some time during this conversation, the witness says Byrne spoke to him, saying:

"Help me take this boy down and put him in the alley. I won't harbor him any more. I am going to see Dr. Whitney, and see if I can have him moved. I can't stand it any more."

Soon after this alleged incident, Matthias was sent to Dubuque, his father paying the hospital for his care. One McLaughlin tells that, 15 years ago, he heard from some source that Byrne had accused him (the witness) of offering him two red pigs, to stay away from a certain law suit. He went to Byrne with the story and denounced it as a lie, but Byrne falsely insisted upon its truth. After that date, the witness and Byrne did not speak to each other. One Morrison says that, on a Sunday in 1914, he, with others, entered Byrne's pasture without permission, to shoot ducks

on a large slough in the enclosure; that Byrne came out to drive them away, but the party continued circling the slough, in a manner to keep Byrne on the opposite side, and thus "kept the old man playing tag all the afternoon." When the hunters started to leave, Byrne chased them a distance of about 60 rods, cursed them, and declared, "I will get you." Collins testified that, in 1906, Byrne told him that he had seven sons, and there wasn't any of them worth powder enough to "blow them to hell," and further said that, when one of his sons (evidently James) came back from the Spanish War, he undertook to "run things;" and that once, when the son persisted in taking a horse from the premises in spite of Byrne's orders to the contrary, the latter went to the house and returned with a loaded gun, and threatened to shoot the young man's head off if he did not leave the animal.

Michael Byrne, a nephew of the testator's and a cousin of the defendants', confirms these statements in several particulars. He says he heard Byrne use harsh and profane language to his children, and that:

"He was continually talking about them and abusing them for not doing their part of the work on the farm. Saw him whip Matthias, when a small boy, and said he would kill him if he did not do his work better, and be a better boy."

Witness saw him beat a horse brutally with a neckyoke, but this was the only occasion coming under the witness' attention of his cruelty to animals. Just before he went to Dubuque, heard him say he was going to die, and the witness advised him to make his peace with God, and consoled him with the suggestion that he "had lived to a ripe old age, and had reached the age when he ought to die and could expect to die." This is the only nonexpert witness, outside of the immediate family of the testator, who expresses the opinion that he was of unsound mind. This

opinion is stated and repeated by him with considerable emphasis, declaring that he had known Byrne for 20 years, and he had been crazy all the time. He thought he was crazy because he talked "like a nut," but it is to be said that he relates no instance of talk or conversation on part of the testator which is necessarily inconsistent with mental soundness.

The expert witnesses examined by the appellees were Doctor Whitney, Byrne's family physician, and Doctor Walker, one of the visiting physicians at the hospital where Byrne was treated in March and April, 1916. To an understanding of some parts of the testimony of Dr. Whitney, it should be here said that the will offered for probate, in addition to being signed and witnessed in the usual manner, had appended thereto a certificate signed by his physician, in the following words:

"I, C. R. Whitney, a practicing physician located at Fonda, Iowa, do hereby certify that on March 1st, A. D., 1913, I visited Matthew Byrne for the purpose of ascertaining his mental condition. I found him to be in full possession of his mental faculties and his mental condition seemed to be in all respects normal.

"C. R. Whitney."

Testifying for the contestants, the doctor says he was the attending physician of the testator's family for the last 10 years of Byrne's life, and that, during that time, Byrne was troubled with cardiac asthma, and at times, with his stomach or bowels. On one occasion, the doctor had treated him for acute nephritis. He signed the certificate above mentioned at the Byrne home. Was there with the persons who witnessed the will, but does not recall at whose invitation. Was attending physician at the time of Byrne's death. The cause of death was general failing of the physical and mental forces. He was having some of his old cardiac asthma. There seemed to be a general

breaking up of the physical forces. His decline began about a year before his death. The witness adds:

"I remember the trip to Dubuque. I had a talk with him before he went to Dubuque. In advising with the family, we concluded it was best to take him to the sanitarium or some place for special treatment. The plan was to get him to go willingly. So it was suggested that he go to Dubuque and visit his son, and he agreed to do that. This suggestion was held out to him to avoid a controversy. My plan was to have him undergo a course of treatment. His mental faculties were somewhat impaired at the time we took him to Dubuque."

The first changed or abnormal mental condition which the doctor noticed in Byrne was just before his trip to Dubuque. After his return home, he was very much improved. Was not exactly normal, but much improved. Was about town, transacting business. He was able to transact affairs of business. He never relapsed into the state of abnormality in which he was when he went to Dubuque. There was some deterioration in his mental condition, as he approached death. When the doctor went to the house in 1913, to certify to the will, he talked with Byrne, examined him physically, and remained with him during the execution of the instrument. On cross-examination, he was asked whether, in his opinion, Byrne was at that time of sound mind, and replied:

"There is no question in my opinion but that he was of sound mind at that time. Prior to 1913, I never discovered any evidence of mental unsoundness in Matt Byrne at all."

Dr. Walker, of Dubuque, testifies to visiting Byrne while a patient at the hospital in 1916, and says of him that he was not at all times able to carry on a sensible conversation. Did not seem to understand where he was. Thought he was at home. Was confused and hesitating in his answers to questions. The witness, after giving a some-

what technical explanation of paresis and senile dementia, expresses the opinion that Byrne was suffering from paresis, with a later complication of senile dementia. He adds to this statement:

"In his case, I believe paresis had only developed to cause a change in his disposition to some extent. The senile dementia developed later on."

Being asked for his opinion, based upon what he saw of Byrne, he said:

"I believe that, during the time that I knew Mr. Byrne while he was a patient in the sanitarium, he was of unsound mind. I think he probably was troubled with senile dementia for a period of three to five years prior to March 1, 1913, and with paresis, at a rough estimate, probably five to ten years before that date."

To a repetition of the question, he asserts that, in his judgment, Byrne had been insane for a period anywhere from eight to ten years. On cross-examination, the witness says that both paresis and senile dementia are ordinarily of slow development, and that men sometimes continue to conduct business for several years, before becoming wholly incapable. The disease, while progressive in its nature, is sometimes remitted or at rest for an indefinite time before resuming its advance. Senile dementia is a gradual breaking down of the brain tissue. "There cannot be sanity where the tissues themselves are deteriorated." Such is, in substance, the contestant's case.

Turning now to the counter showing: While Doctor Walker, for the contestants, says that he alone visited and treated Byrne professionally during his stay at the hospital, the proponent produces Dr. McGuire, of the same city, who testifies that, beginning with April 9, 1916, he attended and treated Byrne, as long as he remained there. He says he found the patient suffering from a nervous condition—not severe. He was able to converse intelligently, and had but

few delusions. Made favorable progress. When he returned home, his delusions had disappeared. His mental condition was practically normal, for a man of his years. Speaking of senile dementia, he further says it is ordinarily a disease of gradual approach, and a sufferer therefrom may, for several years, continue to realize and understand the claims of others upon his bounty, and to appreciate the nature and extent of his property, and be competent to transact ordinary business. He diagnosed the trouble with Byrne at that time as nervous exhaustion, which is to be distinguished from senile dementia, and stated that such condition had been largely produced by worries over his own physical ailments, and was not incurable.

Dr. Murphy, of Sioux City, was an acquaintance of Byrne's from the year 1908, when he first examined and treated him. The witness was also called to see Byrne in consultation with Dr. Whitney, just before the patient went to Dubuque. On both occasions, this physician found that there was some ailment of the patient's heart and stomach, and he testifies that, while such sickness might produce some temporary mental disturbance, it would disappear with improvement of the health in other respects. After a very full discussion of the nature, causes, and development of paresis and senile dementia, Dr. Murphy gives it as his judgment that:

"Mr. Byrne was not, during any of the time that I knew him or had anything to do with him, suffering from either of said diseases. He was not, at any of the time that I knew him, suffering from any mental affection whatsoever, except this psychosis of heart disease."

The will in controversy was, drawn at Byrne's request by E. A. Fairburn, for many years president of one of the local banks, and was witnessed by him and P. J. Mullan, a business man of the town, who had known Byrne 30 or 40 years. The instrument was prepared at the bank by Fair-

burn, from data given by the testator, who directed him, when ready, to call up or bring with him to the Byrne home Dr. Whitney and Mr. Mullan. This was done, and the party of three, with the draft of the will, went to the testator's home, where the instrument was signed by him, and by Fairburn and Mullan as witnesses; and Dr. Whitney attached the certificate already referred to. The proponent was not in the room when the business was done. Byrne had been transacting business with Fairburn's bank for 20 years. Like most men in live stock business, he was a frequent borrower. In the period of from 1913 to 1916, he made Fairburn's bank nearly, if not quite, forty promissory notes, eight of which were dated after his return from Dubuque, several of them being given during the last three or four months of his life.

Mullan had known Byrne quite intimately for a long time, and visited him after he returned from Dubuque, and never noticed any change in him, except that he was not in good physical health. Never observed any indication of forgetfulness or delusion, or anything indicating mental failure. Both these subscribing witnesses express their opinion that he was then of sound mind.

It appears that, a few days before going to Dubuque, he held a public sale, at which he disposed of his horses, cattle, and farm machinery. He himself made all the arrangements for the sale, and at his request, the cashier of another bank in town acted as clerk of the sale. He was in the habit of doing business at this bank also, and, during the three-year period above mentioned, he had made to said bank 23 different notes. He borrowed money and carried an account there after his return from Dubuque. At no time did the cashier see any indication of mental deterioration in him. Both bankers say he was peculiar only in being very exacting and particular in his business transactions, to have everything right. The opinion that he was

of sound mind was expressed by the witness Wood, cashier
of the Fairburn Bank, who had known and dealt with him
for 35 years; by Tolen, a merchant with whom he did busi-
ness for 18 years; by Leef, an implement dealer, who had
known him 12 years; by Hughes, a merchant with whom
he had extensive dealings for 20 years; by F. E. Fairburn,
a lawyer in Fonda, who knew him from 1900 to the time of
his death, in 1917; by Wright, a furniture dealer, who had
known him for 25 years, and had done business with him
for 20 years; by Stumpf, who worked for him on the farm
in the season of 1914, and again in 1916; by Moody, an
insurance man, who had done business with him for 30
years; by Tice, a clergyman, and a near neighbor and in-
timate acquaintance for 8 years; and by Jordon, a real es-
tate dealer, who had known him for 20 years. In 1914, he
employed Jordon to prepare a lease of his farm to a tenant
with whom he made his own terms, and directed the wit-
ness how he wanted the lease drawn. Indeed, there is no
witness produced in the trial from among the neighbors
and acquaintances who had known him and dealt with
him during his long residence in or near Fonda, who seems
ever to have had the least question as to his mental sound-
ness until three or four years after the will was made,
when his health so far failed him as to induce the trip to
Dubuque. His numerous borrowings at the banks were
made on his personal credit, and his soundness both finan-
cially and mentally appears to have been universally recog-
nized and respected. If we lay aside, for the present, the
effect to be given the opinion expressed by Dr. Walker, it
is no exaggeration to say that there is no single fact put in
evidence on either side relating to the history of the life of
Matthew Byrne which is inconsistent with the legal pre-
sumption of his testamentary capacity on March 1, 1913.
He was then but about 66 years old—an age certainly not
so advanced as might of itself suggest the existence of dis-

qualifying senility. He had suffered to some extent from physical ailments, but was then, and for the rest of his life continued to be, as at all times he had been, in possession, control, and management of his own business. In the small town and vicinity where he lived substantially all his mature years, and where he must have been more or less intimately known to practically every inhabitant, not one disinterested or unpartisan witness is found to say that, at or before that date, or even after that date, up to his going to Dubuque, nearly four years later, he exhibited the slightest indication of mental unsoundness. True, some of his own children, who will profit by invalidating his will, declare, in substance, their belief that he had been insane during all the years of the scope of their memory of him; but when we read the expressed grounds of that belief, its worthlessness as evidence is so manifest as to be scarcely open to argument. Accepting the truth of their statements,—and this, for the purposes of this appeal, we do, notwithstanding their inconsistencies in many respects,— the utmost which can be said for their showing is that Byrne was a believer in the doctrine that to spare the rod is to spoil the child, and that he carried the theory into practice to an extent which we of the present day and generation would declare harsh and brutal. There are many people still living whose early experience with strict, old-fashioned parents and school teachers was punctuated and marked with visible proof of the general prevalence of the belief that chastisement of the body is a means of spiritual improvement, and that, in every proper scheme of youthful education, "licking and learning" are to be regarded as inseparable requisites. Much to the comfort of the modern child, that system has, to a great extent, fallen into "innocuous desuetude," and there are now but few who believe that, when Solomon admonished parents to "train up" a child in the way he should go, he necessarily meant to be

understood as saying "trim up;" yet we have not progressed so far beyond the ancient standards that we can afford to impute insanity to a man who still adheres to a theory which but recently had the general adherence of good people. The testimony of the contestants relating to the punishments administered to them by their father in their years of minority shows no instance where the whip was used out of sheer wantonness. They quite agree in saying that, in punishing them, he charged them with disobedience, with failing to do the work assigned to them, or in some other way offending against his parental authority; and the essence of their present complaint, when reduced to concrete terms, is that the punishments were unreasonable and excessive, or that the faults of which he complained were of a trivial character. And this may be admitted; but it does not prove or tend to prove mental unsoundness. But, say appellees' counsel, it appears that he sometimes made the children strip their clothing, in order to increase their suffering from the blows given them. But even that indignity has not been unknown in the family and schoolroom; and, while the act may justly be denounced as brutal, and may expose the person responsible for it to the general condemnation of the community, no one will contend that it is sufficient, of itself, to indicate insanity. It is to be said, too, that the story by Katherine of her father's stripping his girls for punishment, after they had reached the age of young womanhood, is not corroborated by either of her sisters who testified on the trial. If all said of him by his children is true, he was of a quick-tempered, imperious disposition, demanding prompt and exact obedience, and was prompt to punish, often with unnecessary severity. He may have been, and probably was, to a material extent to blame for the estrangement which grew up between himself and his older children; but, as we shall see, the fault was not all on one side. The children conceded that he

provided them with a reasonable supply of food and clothing. He leased his land and moved away for a period of four years, in order to have the advantages of a school. As the boys grew up, he often exhibited concern over what he thought was their waywardness. None of them stayed with him throughout their minority. When Matthias became af- flicted with a disabling disease, which was thought to be of syphilitic character, he was much exercised over the ques- tion whether the boy had brought it upon himself by his own vice. He talked with friends about his family mat- ters, to some extent, and expressed his disappointment over the career of his boys; but, aside from the harshness of his rule or discipline in and about his home, there is little, if anything, to mark his conduct as differing in any material degree from that of the average man having his opportunities and advantages.

Much stress is laid upon the fact that the testator, by this will, gave the children of his first marriage (except Matthias) merely nominal legacies. Counsel admit that he was within his legal right in doing so, but 1. WILLS: testa- mentary capacity: evidence: disinheritance of children. say that it is so unnatural that a father should disinherit his children that the fact is not without weight in considering the question of his mental soundness. It is doubtless true that, if there be other evidence raising rea- sonable question of his testamentary capacity, such refusal to recognize the claims of his family may fairly be con- sidered upon the merits of such issue, but no rule or prece- dent goes to the extent of saying that a finding of mental incompetence may be sustained on that ground alone. An examination of the facts 2. WILLS: tes- tamentary capacity: sufficiency of evidence. in this case takes away very much of the force of appellee's contention at this point.

Mr. Byrne did not marry the second time until about seven years after the death of his first wife.

By that time, his older children had reached sufficient maturity to have pretty well-defined views of their own upon the subject; and, while it is not made a prominent feature of the record, it is not difficult to see that the second marriage was not to their liking, and that some, if not all, of them acquired a dislike for their stepmother. As the years passed, the fact that, as their father's wife, the stepmother, if she outlived him, would share in his estate by law, if not by will, became a subject of their thought, and the question how this might be prevented or circumvented was discussed between them, or at least between some of them. As early as 1906, the son James, who had left home, wrote to his sister Katherine, suggesting ways by which their purpose could be accomplished. Among other things, he says in a letter, "There is a couple of ways she can be beat out of a lot of it, if it is worked right;" and after stating his plan, he adds:

"Let me know if all that property is still in his name. The easiest way is the best way, and it will have to be worked on the sly."

In another letter by James to his sisters, he said, referring to his father and stepmother:

"I would not pay any attention to the old man. All he is after is to get everybody out of his road, so that him and that old slob of his can spend all the money."

These letters fell into the hands of the testator. In 1904, the same son wrote his father grossly disrespectful and abusive letters. Thomas left home when but 14 years old, but later returned, for a time. His final leaving was when about 20 years old, from which date all his relations with the home were severed, and had been for 20 years or more before his father's death. William died at the age of 19, and none of the children of the first marriage, except Matthias, remained at home beyond the age of 20. They had been scattered in various directions for years before the

will was made, and the wife and her two children were all who then remained with the testator. That the two branches of the family should grow apart under such circumstances is quite inevitable, and that the result of it should be reflected in the father's will, even though inequitable, is not at all unnatural. Under these circumstances, it cannot be said that the father's act in giving preference to his wife and the children she had borne him affords any evidence of mental unsoundness. Speaking of the situation in its moral aspects, it may, of course, be said that he should have sought reconciliation with his children, and evidenced his own willingness to forgive and forget, and be himself forgiven, by leaving them some substantial share in his estate; but the duty to seek reconciliation was equally incumbent upon the children, even though they may have felt they had cause of offense against their parent. These duties are, however, without legal significance here. Subject only to statutory limitation, a man may lawfully devise his estate to a single friend, or to one who has no claim of any kind upon his bounty, even though, in so doing, he is actuated by resentment against those who, under ordinary circumstances, might reasonably expect to be favored by him.

What we have said respecting the estrangement between Byrne and the contestants furnishes, also, all the explanation needed of his somewhat unusual act in having his will attested by Dr. Whitney's certificate as to his mental soundness. What he had learned of James' proposal to others of his prospective heirs to devise a scheme for excluding his widow from the benefits of his estate, together with his shrewd appreciation of the fighting qualities of the Celtic strain in the blood of his children, left him in no doubt that they would contest a will unfavorable to them, if ground therefor were discoverable; and with a wisdom which argues powerfully for the soundness of his intellect, he attempted to shut and lock the door against the usual

assault by a disappointed heir upon the will of his ances-
tor. So far as shown, he consulted no lawyer or other
person upon the subject. He selected a banker friend to
draw the will, dictated its terms, selected his own wit-
nesses, arranged for the physician to be present and see it
executed, and at the same time and place certify to his
judgment of the man's mental condition. There is nothing
whatever in the evidence to justify a suspicion that this
act was framed by friends or confederates, to clothe a man
of seriously impaired mind with a false appearance of men-
tal soundness. The banker, the merchant, and the physician
make a clean showing of good faith, and their testimony,
corroborated and supported as it is by the presumption of
law, and by all the witnesses outside of the contestants
themselves (who show no valid ground for their expressed
belief in their father's life-long insanity), makes a record
upon which it must be said, as a matter of law, that the
verdict of the jury is without support.

The testimony of Dr. Walker alone is not enough to
raise a jury issue upon this question. In the first place,
while he is quite positive that, when he saw Byrne three
years after the making of the will, the testator was suffer-
ing from paresis and senile dementia, and states as his
judgment that the process of deterioration must have cov-
ered a period of five to ten years, he does not say, and
in the very nature of the case, as he states it, it is impos-
sible for him to say, to what extent that loss of mental
power had reached at the date of the will, three years be-
fore he ever saw the man. He tells us, as do all the other ex-
pert witnesses—as, indeed, we know from common observa-
tion and knowledge—that the mental decay attending these
diseases is ordinarily of slow development, and, while
progressive in character and incurable, its progress is at
times remitted or suspended for indefinite periods; and
that men sometimes continue in business for several years,

without any marked exhibition of mental incompetence, before the deterioration results in complete incapacity. Such being an admitted truth, it is, as just said, impossible that Dr. Walker should be able to say that, on March 1, 1913, Matthew Byrne did not have mind enough to know the nature and extent of his estate, or to appreciate the claims, if any, of his children upon his bounty, or to make an intelligent devise of his property to the very persons whom he desired to receive it.

We have, time and again, held that mental weakness or decay will not invalidate a will, until it has reached that stage which deprives the testator of capacity for intelligent action. Dr. Walker's testimony indicates the view that, in the scientific sense of the term, a man is insane from the instant when the brain tissue begins to deteriorate. Without attempting to debate that proposition with the witness, it is enough to say that the law recognizes no degree of mental decay as sufficient to deprive the person of testamentary capacity which does not deprive him of intelligent comprehension of the estate he is devising, or of his capacity to appreciate the nature and effect of the distribution he makes of such estate. His memory may be impaired; he may lack the mental qualities or alertness of youth; he may not be able to transact business generally, or to enter into complicated contracts; and still be able to make a valid will. Bearing these propositions in mind, it becomes apparent that Dr. Walker's opinion is insufficient to supply the lack of material support for the verdict which the record otherwise discloses.

3. WILLS: testamentary capacity; mental decay: intelligent comprehension of devised estate.

We think it unnecessary to review the authorities bearing upon the issues tried. The subject has been discussed, and the rules of law applied so frequently, that we will not extend this opinion for their further restatement. We con-

tent ourselves, at this point, by simple citation of the following cases: *Bales v. Bales,* 164 Iowa 257; *Zinkula v. Zinkula,* 171 Iowa 287; *Gates v. Cole,* 137 Iowa 613; *Speer v. Speer,* 146 Iowa 6; *Perkins v. Perkins,* 109 Iowa 216; *Sevening v. Smith,* 153 Iowa 639, 642; *In re Will of Stufflebeam,* 135 Iowa 338; *Stutsman v. Sharpless,* 125 Iowa 335, 340; *In re Will of Kester,* 183 Iowa 1336.

II.   Among other things, the court instructed the jury as follows:

"You are instructed that the fact, if shown, that the testator transacted his own business, and to all outward appearances seemed to be of sane and sound mind, to those with whom he came in contact in a business or social way, while competent to be considered on the question of sanity, does not, of itself, conclusively establish sanity; and you are instructed that a state of mental unsoundness may exist in such person which would render him incompetent to make a will, notwithstanding his apparent sanity to those with whom he comes in contact, and who are not experts upon the subject of insanity; and in determining whether or not the testator in this case was of sound mind or was of unsound mind, at the time of the execution of the said instrument, Exhibit M, you should take into consideration and carefully weigh all the evidence introduced and submitted to you bearing on this subject, and therefrom, aided by these instructions, determine and say by your verdict what the very truth of the matter is. And you are told that any impairment of the mental faculties which creates unsoundness of mind, as that term has been hereinbefore defined, disqualifies a person from making a will, even though he has not reached the state of absolute insanity or imbecility."

4. TRIAL: instructions: opinion evidence: error.

Error is assigned upon the giving of the foregoing para-

graph, but question is raised that no sufficient exception was preserved thereto.

In view of the possible retrial of the case, we think it proper it say, without regard to the sufficiency of the exception, that the court's charge in this particular cannot be approved. It is open to two objections.

1. We think the jury would be likely to understand therefrom, though we are quite sure the court did not so intend, that, although all the nonexpert witnesses coming in contact with the testator in a business or social way unite in the opinion that the testator was of sane and sound mind, yet such opinion must yield to that of the experts.

2. The proposition that "any impairment" of the mental faculties which creates unsoundness of mind disqualifies a person from making a will, even though he has not reached the state of absolute insanity or imbecility, is likewise misleading. To be sure, the words "unsoundness of mind" in that connection may be given a meaning which would make the instruction harmless; but a jury of laymen, especially if at all sympathetically inclined against the will, would readily seize upon the phrase, "any impairment of the mental faculties," as a vaulting pole for a leap to the conclusion that even a slight impairment is all that is necessary to sustain a finding for the contestant.

5. WILLS: validity: testamentary capacity: instruction: unsoundness of mind.

We doubt, also, whether there is any evidence in the record to justify the instruction, even if it be accepted as a sound statement of law.

For the reasons stated, the judgment and verdict below must be set aside, and the cause remanded for a new trial.—*Reversed and remanded.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.