LENA SEVENING et al., Appellant, v. GEORGE HENRY SMITH et al., Appellees.

Wills: MENTAL CAPACITY: EVIDENCE. The mere fact that a will is unreasonable or unjust in its terms, which may be considered in connection with evidence of the testator's mental capacity, is not of itself sufficient to avoid it for mental incapacity.

**Same.** Mere impairment of the mental faculties from old age or disease will not avoid a will, if the testator still retains sufficient mental power to know in a general way the objects of his bounty, the nature and extent of his estate and his intended distribution of it.

**Same:** BURDEN OF PROOF: DIRECTION OF VERDICT. The burden of establishing a testator's mental incompetency is upon the contestant of a will, and when giving his evidence the strongest probative force it is clear that a verdict for him should have been set aside by the court, a directed verdict for the contestee is proper. In this case the evidence is held insufficient to invalidate the will on the ground of mental disability.

**Exclusion of evidence:** HARMLESS ERROR. The admission of other evidence covering the same point as that erroneously excluded cures the error; and where the question arises on appeal from a directed verdict, the admitted evidence will be accepted as true.

**New trial:** NEWLY DISCOVERED EVIDENCE. Where a party acquires knowledge of material testimony during the trial and fails to ask for time and opportunity to procure it, he is not entitled to a new trial on the ground that it was newly discovered; especially if no affidavit of the witness whose testimony was claimed to be newly discovered was attached to the motion and no reason was given for not doing so.

*Appeal from Benton District Court.*—Hon. J. M. Parker, Judge.

Friday, January 12, 1912.

This is a contest over the will of George Smith, deceased. Plaintiffs, who are contestants, are the daughters and grandchildren of the deceased. Defendant, George Henry Smith, is a grandson and one of the principal beneficiaries under the will, and the other defendants are the executors named in the will. The defendant, George Henry Smith, is a brother of the contesting grandchildren. The grounds for the contest are the mental unsoundness and incapacity of the testator. In one of the pleadings filed it is charged that he was afflicted with *senile dementia* at the

time the will was made, and in another general mental and physical incapacity is alleged. A jury was called, and after the introduction of the testimony the trial court, on motion of the proponents, directed a verdict in their favor and ordered that the will be admitted to probate. The contestants appeal.—*Affirmed.*

*Tom H. Milner,* for appellants.

*Kirkland & White,* for appellees.

DEEMER, J.—Testator died June 20, 1909, at the age of eighty-one years. For many years prior thereto he had been afflicted with chronic bronchitis and organic heart trouble, but had been able to be about and to attend to his ordinary affairs down to within a few weeks of the time of his death. The will in controversy was executed March 5, 1909. It was drawn at testator's direction by one John Smith, the cashier of a bank in the town of Norway, duly signed by the testator, and properly witnessed. By the terms of this instrument he gave his wife all the household goods, and bequeathed to his grandson, George Henry Smith, all his real estate wherever situated, upon condition that he, the said grandson, pay to his wife the sum of $500 annually during life; pay to Lena Sevening, one of his daughters, the sum of $500 with interest; and to Elizabeth Boddecker, another daughter, the sum of $1,500. Provision was made that the widow should have the use and free occupancy of the house, yards, and orchards on the farm where testator then resided, or upon which he might reside at the time of his death. The remaining personal property was bequeathed to the said grandson and to the two daughters, share and share alike. No direct devise, legacy, or bequest was made to any of the other heirs, and none of the other grandchildren, of which there were four aside from George Henry, were in any way remem-

bered. Another and former will, which was revoked at the time of the execution of the one in question, devised all of testator's real estate and one-third of his personalty to a son, Henry Smith. This son died early in February, 1909, and by reason of that fact, the one now contested was executed and the grandson substituted as a devisee or legatee in place of the son. The first will was used as a guide when the second one was drafted. It was drawn at the request of testator, who stated to the scrivener what he wished to have incorporated therein. It is conceded that testator's estate amounted to something like $35,000. But it is also shown that the daughter Mrs. Sevening, and her husband, had property worth something like $37,000; that the daughter Mrs. Boddecker had property worth $20,-000; that the deceased son had two hundred and forty acres of land and $5,000, which went to his children upon his demise; and that the wife of testator, who survived him, took one-third of his estate, and upon her death the property passed to her heirs, who are the active parties to this litigation. Moreover, it is shown, that George Henry Smith was the favorite grandson of the deceased, and that none of the direct heirs of the testator were left in want. Although a little out of order, we may say that there is nothing in the disposition of the property as made by the will, which indicates a disordered mind. In this connection we may well quote from some of the cases.

Thus in *Trotter v. Trotter,* 117 Iowa, 418, we said: "While the fact that a will is unreasonable or unjust may be considered in connection with evidence bearing on the condition of testator's mind, it is not a ground for refusing probate. *Webber v. Sullivan,* 58 Iowa, 260; *Muir v. Miller,* 72 Iowa, 585; *Denning v. Butcher,* 91 Iowa, 425-438; *Manatt v. Scott,* 106 Iowa, 203-216. Whether a will is just or unjust is not in and of itself a question for the jury, for a person has the legal right to make an unjust disposition

1 WILLS: mental capacity: evidence.

of his property if he does so intelligently. Courts do not make wills for persons; when upon investigation they determine that an instrument is a will, it must be recognized as such, however unfair its provisions may be." And in *Johnson v. Johnson,* 134 Iowa, 34, this language was used: "That its provisions were unequal when considered with reference to those having claims on her bounty may be conceded. When equality is intended, there is no occasion for the execution of a will. The law wisely secures equality of distribution when a person dies intestate. Testamentary disposition of property is seldom entirely satisfactory to all having claims to consideration. The infirmities of human nature are likely to be evidenced in the last testament, voicing the dictates of affections and enmity, the partialities and dislikes of the testator while living. But to all these he has a right, and, if he chose, might be unjust in the disposition of his property." So that there is nothing in the terms of the will itself which in any manner indicates mental unsoundness.

But it is strenuously argued that enough other testimony was adduced by contestants to take the case to a jury on that issue. The discussion of that subject may well be prefaced by this quotation from one of our recent cases, with reference to the law applicable to such an issue: In *Perkins v. Perkins,* 116 Iowa, 259, we said: "The right of a man to dispose of his property by will as he sees fit is one which the law is slow to deny. No mere weakening of the mental powers—no mere impairment of the faculties—will invalidate a will executed in due form, so long as he retains mind enough to know and apprehend in a general way the natural objects of his bounty, the nature and extent of his estate, and the distribution he wishes to make of it. It is not necessary that he should be competent to make contracts or to transact business generally. . . . Old age and failure of memory do not of themselves necessarily take

2 SAME.

away a testator's capacity to make a will. . . . His mind may have become debilitated by age or disease, the memory enfeebled, the understanding weakened; he may even want the capacity to transact many of the business affairs of life; but, if he has mind enough to recollect the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them, he has testamentary capacity. . . . The exclusion of some or all of his legal heirs from the benefits of a will is not sufficient evidence of incapacity." Again in the same case it was said: "The similarity of the provisions of the instrument herein sought to be probated with the one executed about a year previous to the death of his son is evidence that the testator had a deliberate and intelligent purpose in making the bequest to his son, and after the death of his son, to his grandson, the principal beneficiary under said instrument last executed."

The burden was upon contestants to show that testator was mentally unsound and incapable of making a will. But, as the verdict was directed, we must give to the testimony produced by them its strongest probative force. Yet, if, when so considered, it appears that it would have been the duty of the trial court to have set aside a verdict for contestants, had one been rendered, then there was no error in directing a verdict after all the testimony was adduced. *Meyer v. Houck,* 85 Iowa, 319; *Hurd v. Neilson,* 100 Iowa, 555; *Beckman v. Coal Co.,* 90 Iowa, 255.

3 SAME: burden of proof: direction of verdict.

The testimony shows that while testator was affected with chronic bronchitis for some years before his death, and at one time became overheated, and as a result had dizzy spells from time to time, yet there is no claim that his mind became affected to such an extent as to disqualify him from making a will until the death of his son Henry, who was the chief beneficiary under a former will, which death occurred in February of the year 1909. It is said

that this death caused testator great grief, and that from that time on his mind began to fail, and was so diseased at the time he made his will, in March of the same year, that he did not have the mental capacity to make it. It appears that for something like two years before his death testator's wife was an invalid, who, because of a paralytic stroke or some other ailment, was practically helpless and required constant care; that during this time the two, husband and wife, lived alone upon their farm, save as a hired man was with them; that testator took care of his invalid wife until about three months before his death, when she was taken to Mrs. Boddecker's that she might have better attention. About two weeks before testator's death, he also went to the Boddeckers' to live. Before that he had looked after his business affairs and was successful in their management. For about nine days before his death testator was unable to do anything, and by reason of his heart trouble, could not lie in bed. As the end approached, he became feeble both in mind and body, and a few days before his demise, had some hallucinations which his doctors said were due to the poison in his system, and not to a disordered mind.

The chief incidents relied upon as tending to show mental unsoundness are the following: While his wife was sick, he refused to call a doctor or to provide her with a nurse. It is shown, however, that one of the granddaughters was at the house almost daily and looked after part of the housework, and that testator did not call a doctor for the reason that he thought it would do no good. But the uncontradicted evidence shows that a doctor was in attendance upon her during her illness at her own home. It seems that at times, while he was sole nurse, testator left his wife for a few hours at a time to look after his own private affairs, believing that, as she was practically helpless, no harm would befall. He expressed a wish that his wife would die before him, at times stating that he

did not wish her to be left alone, and at other times saying that, if she did so, he could dispose of all of his property as he would. It is also shown that at times he was forgetful, that he muttered to himself, repeated his conversation to the same person, and often did not recognize his own kin. He also complained of his head after the death of his son, and said that he thought he was losing his mind. At one time he started to milk the cows at about 2 or 3 o'clock in the afternoon. It was also shown that a neighbor, who had been away for about three months, called at testator's house, and testator said that he thought this neighbor had been away for a year or more. Testimony was also adduced tending to show that after the death of testator's son he became forgetful, left packages at a neighbor's, and failed to remember his errands into town. It was also shown by at least one witness that, after the death of his son, testator would mutter to himself, become excited, gesticulate with his hands, and complain of pain in his head. He stated on several occasions before his death that he did not know what he was about, and that "his boy's death would use him up." These are the salient points of contestants' case. Some of them are explained in the testimony adduced for proponents, but, taking them all as true, contestants' expert witness finally stated that they constituted no evidence of *senile dementia,* and his answer to a hypothetical question containing these and other matters was: "I don't know as one could give a very intelligent answer to that question. It is considerably mixed up. There is a good deal of evidence in that showing he did have some mind and that he was capable of reasoning, and there are other points in that question that looks as though he was a little unbalanced." No hallucinations are shown save those which arose when dissolution was imminent. There was no melancholia, but undoubtedly, if the testimony is to be believed, forgetfulness and loss of memory. Notwithstanding this, he continued

to conduct his business with circumspection down to the time of his last illness. It is not shown that his forgetfulness was due to anything other than his age, and his complaints as to his head were not of themselves evidence of insanity.

It is shown that testator always had a peculiar method of gesticulation. Aside from his relatives, who are contesting the will, no one noticed any change in testator's mental condition after his son's death, save that he seemed to be much affected thereby. His grandson, George Henry Smith, was his favorite, and he expressed to others the thought that he had done for his other heirs all that he thought they were entitled to. The incident with reference to the milking of the cows is explained by testimony to the effect that testator did so to gratify a whim of his invalid wife, who, it seems, was very weak in mind and body. The testimony from doctors was to the effect that this invalid wife was given all the medical attention which her case demanded, and that they were called to her bedside quite a number of times during her illness, which, as we have seen, continued for more than two years. There is no testimony that she needed any attention which was not given, and no showing of any conduct on the part of testator toward her which would indicate unsoundness of mind. During all of the time, down until two weeks before his death, testator attended to his business with judgment and discretion. He talked over the matter of his property, the claims that his relatives had upon his bounty, and gave reasons why he made the last will as he did. He also had reasons which he gave for making the first will in favor of his son, and after the son's death, knew it was necessary to make a change in the will, which he did. He was left alone, save as a renter was either in the house or near at hand, with his invalid wife, and his daughters, who are contesting the will, never indicated that they thought he was incompetent to take care of their mother

until about three months before his death. Even then they thought him perfectly competent to look after his own affairs. These daughters did not often visit the testator while he was taking care of his invalid wife; but the Smith children evidenced more concern, and quite frequently helped with the housework. It is true that testator frequently complained of his head after the death of his son, and said that he thought he would lose his mind, or words to that effect; but these things are not necessarily evidence of insanity. All the physicians who attended the testator gave it as their opinion that he was sound of mind, and no witness, either expert or nonexpert, gave an opinion to the contrary, save as may be gathered from the equivocal answer of the expert who responded to the hypothetical question as hitherto stated. Of course, opinions from witnesses, either expert or nonexpert, are not required if there be other testimony showing or tending to show insanity; but, when the case depends entirely upon evidence as to conduct, such conduct, in the absence of opinion testimony, must be such as to convince the guarded judgment of a reasonable man not only that it is possible, but entirely probable, that the idiosyncrasies shown were due to a diseased or disordered mind, and not to natural mental decline incident to old age or to peculiarities of temperament or to mistakes of judgment or other foibles incident to the "will's defects, the blood's excess, or the earthy humors which oppress mankind." The case is devoid of any showing, indicative of *senile dementia,* melancholia, or any other form of insanity with which we are familiar. True, during the last week of his journey here on earth testator was troubled with hallucinations; but these were not such as to lead to the conclusion that they had existed for any length of time—indeed, they are fully explained by the doctors as due to his bodily condition. Forgetfulness is not in itself indicative of insanity, and failing eyesight often is a legitimate excuse for not recog-

nizing friends or near relatives. The testimony adduced by contestants did not make out a *prima facie* case. At best, there was nothing more than a scintilla upon the issue tendered. In such cases a verdict should not be permitted to stand. This being true, there was no error in directing a verdict for the proponents.

Some rulings on the receipt and rejection of testimony are complained of. Some of these were erroneous, but the error was cured by the admission of other testimony to the same point. If the case had

4 EXCLUSION OF EVIDENCE: harmless error.

gone to a jury, and there had been an adverse verdict, the situation would be different from what it is as the matter is now presented. For the purpose of this appeal we must accept this testimony as true, and it does not need corroboration. Hence, the admission of other testimony covering the same point cures whatever error there may have been in the ruling.

Contestants filed a motion for a new trial on the ground of newly discovered evidence. This motion was overruled, and, as we think, correctly. They had infor-

5 NEW TRIAL: newly discovered evidence.

mation regarding this witness' testimony before the trial was concluded and did not ask to be allowed to procure his testimony or for a postponement until they could get it. This in itself was sufficient ground for denying the motion. *State v. Morgan,* 80 Iowa, 413. Aside from this however, no affidavit from the witness whose testimony it is claimed was newly discovered was attached to the motion, or any reason given for not doing so. The affidavit attached to the motion was purely hearsay and not sufficient basis for a new trial. *Hand v. Langland,* 67 Iowa, 185.

The case is no stronger, if as strong in its facts, than *Perkins v. Perkins, supra; Gates v. Cole,* 137 Iowa, 613; and *Holmberg v. Phillips,* 78 N. W. 66, in each of which we held the testimony insufficient to take the case to a jury on the question of mental unsoundness. See, also,

*In re Stufflebeam,* 135 Iowa, 338; *Furlong v. Carraher,* 108 Iowa, 492.

Finding no prejudicial error in the record, the judgment must be, and it is, *affirmed.*