IN RE WILL OF MARY E. KESTER.

PERRY SIMMONS, Appellee, v. WOMEN'S HOME MISSIONARY SOCIETY et al., Appellants.

WILLS: Testamentary Capacity—Evidence—Weight and Sufficiency. The fact that a testatrix was, at the time of the execution of a will, in pain, and possessed impaired mental faculties, does not necessarily stamp her as one lacking testamentary capacity.

*Appeal from Humboldt District Court.*—N. J. LEE, Judge.

MAY 17, 1918.

REHEARING DENIED JUNE 27, 1918.

CONTESTANT objected to the probate of the will, on the ground of alleged undue influence and mental incapacity. The formal execution of the will was admitted. There was a trial to a jury. At the close of the evidence, contestant withdrew the issues as to the alleged undue influence. The jury found for the contestant, and proponents appeal.— *Reversed.*

*Edith Prouty, Dunshee, Haines & Brody,* and *Samson & Steer,* for appellants.

*L. W. Housel* and *Robert Healy,* for appellee.

PRESTON, C. J.—The point which appears to be most seriously argued and relied upon for a reversal is as to the sufficiency of the evidence to sustain the verdict. This question was properly raised by motions to direct a verdict, at the close of proponents' evidence and at the close of all the evidence; by motion for new trial, etc.

Other assignments of error are that the court erred in permitting witnesses to testify that deceased was of unsound mind on the day the will was executed, for the reason that the witnesses did not see deceased at that time; also in refusing to give an instruction requested by proponent.

1. We have carefully examined the record, and have come to the conclusion that, under our authorities, the evidence is not sufficient to sustain the verdict. We shall not set it out in detail, but will endeavor to set out the evidence as favorably to contestant as the record will justify, and refer to proponents' evidence in a still more general way. First, though, we may properly set out those facts about which there is little or no dispute.

The will was executed February 3, 1915. It appears that, at the time of her death, on April 21, 1915, testatrix

was a widow, about 70 years of age, and childless. Her husband had died nearly 30 years before; she never had but one child, and it died in infancy; after her husband's death, she lived with her parents on a farm, until about ten years before her death, then moved to Humboldt, as she was not strong; about 28 years ago, she was visiting a cousin in Creston; complained of her head; she went to some faith healers, an old man and woman, who claimed they could cure her by divine power; she took a few treatments of them, and a brother of deceased testifies that she told him she had agreed to deed her property to them, if they would cure her and take care of her through her life; he claims that he prevented her from doing so. After that, and some years before her death, her brother testifies that she was assisting in a revival meeting at Sheldon, where she met a man whom she married on a short acquaintance—concededly a foolish marriage. This marriage was shortly annulled, because the man had another wife or wives living. Contestant contends that this man married her for her money; and that is undoubtedly true, but he did not succeed in obtaining it. Deceased died as a result of cancer of the stomach. Some years before her death, she had a cancer of the breast, which, with a part of the muscles of her arm, was removed. Before that, she had a cancer of the lip, which was cured by treatment, without an operation. About August, 1914, she began to complain that her foot or limb bothered her, and the difficulty increased until she was not able to go to church, after about the first of December, 1914. She went to Hot Springs, February 8, 1915, a few days after the will was executed, and was then suffering from what she supposed to be rheumatism, and perhaps some other troubles; she did not go to Hot Springs to be operated upon for cancer or anything of that kind; up to the time of her going away, she had not, at any time, been confined to her

bed; she sat up in her chair most of the time,—a part of the time with her foot upon a chair.

At the time of the execution of the will, according to the testimony of her nurse, who was also the other subscribing witness to the will, deceased was thin and frail looking, and was not able to walk alone scarcely any of the time; complained of her head and limb; she was sleepless at night; her appetite was pretty good, usually; and deceased said she could not read any more; deceased asked witness to read Scriptures to her; this was the daily practice, twice every day; deceased forgot about her key to the bank box; said that one of the ministers came so often that he annoyed her, and that he was wanting money, and she asked the nurse to phone him and stop his coming, which was done; this was the day before she went to Hot Springs; deceased told her, after the will was made, that she had had her will made two or three times, and it didn't suit her yet, and she expected to have it changed, and that she could have it made again: deceased told her she had always intended to give the Dakota land to foreign missions, but keep her Clay County land; in talking, she would change the subject; deceased paid witness for her services in cash; she paid the medical expenses of the house through the nurse; gave witness a check to get money at the bank; talked of her property. Witness gives her opinion that deceased was of unsound mind.

Counsel for appellants strenuously insist that the testimony of this witness does not justify the expression of an opinion as to the mental condition of deceased, and they make the same claim as to other witnesses. However this may be, as to the witness Mrs. Little, she was one of the subscribing witnesses to the will, and we think her testimony is at least weakened by that fact. Some of the cases hold that the legal effect of this is to assert the mental capacity of deceased, and affects the credibility of the witness. *Sellars v. Sellars,* 2 Heisk. (Tenn.) 430, 432. Appellants of-

fered an instruction on this point, which, or one of similar import, might well have been given.

Deceased's own brother, whose testimony we have before quoted, testifying as a witness for contestant, testifies that, up to the time the will was made, deceased was perfectly able to recognize all of her relatives; and that there never was a time, up to then, when she was so feeble that she did not know all of her friends and neighbors who came to call upon her.

She inherited the quarter section of land in Clay County, Iowa, from her husband. Some years before her death, she sold one 80 of this to her brother Thomas, a Methodist minister in Dakota. She had a piece of land in South Dakota; and, on the advice of a brother, she sold, and invested in North Dakota, and made $8.00 an acre on this. She reinvested in other Dakota land, which was not profitable, and her brother took it off her hands. The other half of the quarter section in Clay County she conveyed to the Women's Foreign Missionary Society, a corporation, at the agreed value of $11,121, upon the agreement of the corporation that they would pay her an annuity of 5% upon that value, in half-yearly payments, during the remainder of her life. The annuity was paid to her as long as she lived. Her brother testifies that she told him that some church people came to her and solicited means for the missionary cause, and came to her for a donation; that they were persistent. She claimed the Dakota land was missionary money, and that she was going to give that to the missionary cause. It is not quite clear from the record whether this Dakota land was a part of the deed for which an annuity was to be paid. As we understand it, it was so. She received about $3,100 or $3,200 from her father's estate; so that she had, up to the time of her decease, in addition to the annuity agreement of $556 a year, property, above her liabilities, of about $7,500,

including her home in Humboldt. She employed an attorney in Humboldt to assist her in looking after her investments. She deposited her money in a bank, and drew checks upon it for disbursements; 35 of these checks were introduced in evidence, bearing date from September 23, 1914, to February 12, 1915. Some of these were in her own handwriting; and drawn after the execution of the will. Deceased was a reader of books of the most substantial character. The man who was her pastor from October, 1913, during the remainder of her life, testified that she frequently obtained books from his library of that character; that she was a positive woman, of positive convictions, and used her own judgment; that she consulted him, but reached her own conclusions; and that she was a devoted Christian woman,—was devoted to her church work and to charity work. The provisions of her will, which will be referred to, were in line with this work in which she was interested. She was always well satisfied with the investment of money in the life annuity. She was a member of the Methodist church, and a member of its board of trustees, at Humboldt; she was class leader in the church, and a member of the official board, the business board of the church. She was one of the most regular attendants at the meetings of the board, in which she had an active part, and the evidence tends to show that she was a vital part of the business of the church, and her opinions were always regarded by her pastor as of value on the board.

About December 1, 1914, she began to prepare for the execution of her will. She consulted with her pastor about it, and about making a final disposition of her property; inquired about the different church boards and about the Children's Home. He made no suggestions as to what disposition she should make of her property. About January 1, 1915, she asked Mr. Garfield, who had been her attorney for many years, to come to her house, and talked with him

about her will, stating that she had several matters in mind, but did not at that time wish to give specific directions for having it prepared,—simply wanted to discuss some matters. She spoke of the local church and the Women's Missionary Society, and of the Iowa Children's Home; she had some literature from this institution; her attorney did not, at that time, make any suggestions as to what bequests she should make. On the same date, she wrote Rev. Slothower, superintendent of the Des Moines district of the M. E. church, asking for information and documents necessary for filling out bequests to the Women's Home Missionary Society. Her letter was answered in a few days, and again, about January 10th, she wrote him another letter, in which she stated that she wished to give $2,000 to the Home Missionary Society, and that, if she lived until fall, she might give $500 for the young people he was interested in, but for the present, to send blank only for the first-named society. On the day the will was executed, she again called for Mr. Garfield, who went to her house. She stated to him that she was about to go south for her health, and desired to have her will prepared before going; she gave him directions respecting it; he made a memorandum of them, and went to his office and prepared the will; later in the day, he returned to her house, where the will was executed. Mr. Garfield, as a witness, goes into detail as to all that was said and done by her in regard to her property and the persons she desired to provide for, and says that she discussed her brothers and sisters. At one point the provision was not as specific as to a certain branch of the work of one of appellants as she desired, and at her request the attorney interlined with a pen, making it more specific. He states that she was of sound and disposing mind at that time.

She left surviving five brothers and two sisters. By her will, she gave $2,000 to the Women's Home Missionary Society of the Des Moines Conference of the M. E. Church,

a corporation at Des Moines, and expressed the desire that this sum be used for the support of Deaconess' work in Des Moines; she gave $2,000 to the Iowa Children's Home Society; to the Board of Home Missions of the M. E. Church, with headquarters in New York City, $250, specifying the particular purpose for which it should be used; $250 to the M. E. Church of Humboldt, Iowa, to be directed by the Ladies Aid Society of said church; to her sister Sarah A. Esher, $600; to her sister Rhoda Kester, $300; to her sister Caroline Spohn, $300; and the residue to her three sisters above named, share and share alike; and provided that, if she should use her means during her lifetime to the extent that it should be insufficient to pay all bequests, then the same should be paid pro rata. She nominated her brother, James F. Simmons, executor.

The financial condition of her brothers and sisters is shown. Some of them are well to do; others, not so well. After the execution of the will, on one or two occasions, she expressed some dissatisfaction with its provisions, and said that she was going to have it changed.

Three or four of her brothers and sisters testified for contestant, and these include contestant himself, as well as other witnesses. The tendency of the testimony for contestant, in addition to that already set out, some of which is more or less in the nature of conclusions, is that she was forgetful: She forgot that she had paid her church subscriptions; she forgot that her brother had paid her money; thought he had made a mistake, and in some instances it was found that she was mistaken; for two years before her death, she would break off, in talking, and would not finish the sentence, and as she grew weaker, she grew worse. Some of the witnesses had noticed these peculiarities for ten years or more. There is testimony that her eyesight failed, along with her health; that she said she was going to will property to her brother, the contestant, because he had

helped her out of the Sheldon difficulty; that, in recent years, there was loss of memory. One witness puts it that she talked very intelligently and interestingly, and then would forget what she was talking about, but says she did not seem to have any hallucinations, and nothing of what the doctors call mania or insanity, except just that, in her conversation, she would forget what she had been saying; and that she was a bright woman to visit with, but was a poor manager, financially. The same witness says that deceased made the bargain for her care with the nurse; that the witness considered her rational; that deceased was a Christian woman, if one ever lived,—a woman of rather extraordinary character and piety. A sister testifies that the principal thing she criticized about the mental condition of deceased was her forgetfulness. Dr. Doan, the only medical witness who testified in the case, and who was her attending physician, towards the last, had seen her occasionally and prescribed for her, but did not see her professionally, outside of his office, until December, 1914; from that time until February 4th, he saw her at her home ten or a dozen times. He gave testimony as to her condition, and gave his opinion that she was of unsound mind. He says that, from 1906 until the fore part of 1915, she was in fairly good physical health; that she was nervous and irritable, after February 4th, and suffering from malnutrition; that, though her body might appear plump and well nourished, the blood and nervous system were suffering from lack of nutrition, and he attempted to supply to the system the elements she was unable to obtain from food. He says that dementia is a mental condition divided into many phases, and that her case would be called a secondary form of dementia, caused by some other things than the dementia itself; that, in such a case, well advanced, the person is forgetful, irritable, and has not ability to follow an argument or complete a sentence. He thought that deceased, in the latter

years of her life, had dementia. When asked about how long, he answered:

"A. Well, without perfectly close observation over a continued period, it is a difficult disease to diagnose, when compared with other mental conditions and physical conditions in the female, especially at her age; but from this view, I would think that the supposition that that was the trouble could easily be stated around 1910 and 1911, at the time she was taking care of her mother; at that time her own health was reasonably good. She had most of the,—so far as I could see,—of the care of her mother. And except for that feature, there was a forgetting, and failure to comprehend the details of the plan of treatment."

He thought she had not the mental capacity to transact any business where it would require acuteness of mind, or determining values, or the consequences of an act. He says that she always recognized him, and had the capacity to recognize her brothers and sisters; that she asked for his bill; that she transacted her business with him intelligently, so far as handling money and things of that kind was concerned,—paid her bills in a perfectly intelligent way: but he did not know anything about whether she had the mental capacity to attend to the minor, current business affairs of her life. He thought she would not have the mental capacity to fill out a check; and yet the undisputed evidence is that she did so. He did not think it possible for her, unaided, in January, 1915, to write an intelligent letter in regard to her property and what she would will to do with it; and yet the undisputed evidence shows that she did so. He thought it not possible for her to have received her friends and talked with them intelligently upon a subject that might interest her, and thought she would not be able, during January and February, 1915, to see her lawyer and tell him in an intelligent way what disposition she wished to make of her property; and yet she did these things.

We have set out the evidence more fully, perhaps, than necessary; but we have not, of course, set out all the evidence. That referred to fairly sets out the substance of the testimony for contestant. On the other hand, 15 or 16 witnesses for proponents testify as to their long acquaintance with deceased, and their observation of her conduct, appearance, conversation, and her method of doing business; and give their opinion that she was of sound mind.

Appellants' contention is that the verdict is not sustained by sufficient evidence, and is against the weight of the evidence; that the case should not have been submitted to the jury. They cite, among other cases, *Perkins v. Perkins,* 116 Iowa 253; *In re Estate of Perkins,* 109 Iowa 216; *Gates v. Cole,* 137 Iowa 613; *Sevening v. Smith,* 153 Iowa 639; *Des Moines Nat. Bank v. Chisholm,* 71 Iowa 675; *Fothergill v. Fothergill,* 129 Iowa 93; *In re Estate of Townsend,* 122 Iowa 246; *Mitchell v. Mutch,* 180 Iowa 1281.

Some of these cases involve the validity of contracts, and mental capacity to make a valid contract, which requires a higher degree of mental capacity than to make a will. It will serve no useful purpose to quote from these cases, or to state the facts. It is sufficient to say that we have examined this record with care; and it seems to us quite clear that the instant case is not as strong in its facts as the cases cited, where it was held that the evidence was not sufficient to sustain a verdict setting aside the will. It is true, of course, that deceased was and had been suffering physical pain; that there was some weakening of her mental faculties,—but not sufficient to justify the conclusion that she was not competent to transact the business in hand. The fact that she contracted an unfortunate or foolish marriage, a good many years before, while a circumstance, is not persuasive: there are many such.

We are inclined to the view that the court erred in permitting witnesses who were not present at the time of the

execution of the will to testify as to her mental condition at that time. It is true that Dr. Doan testified that there was dementia in some degree. But, taking all his evidence and all the other evidence together, we think there was no such general derangement of the mental condition of testatrix as to render such evidence admissible. *Fothergill v. Fothergill*, supra; *Blake v. Rourke*, 74 Iowa 519; *Speer v. Speer*, 146 Iowa 6.

There may be other matters of minor importance argued, but what has been said is decisive of the case, and we shall not prolong the opinion to go into further detail.

It is our conclusion that the judgment ought to be, and it is,—*Reversed.*

WEAVER, GAYNOR, and STEVENS, JJ., concur.