## IN RE WILL OF WILLIAM RENNE.

### PAUL RENNE et al., Contestants, Appellants, v. GUS RENNE et al., Proponents, Appellees.

**WILLS: Testamentary Capacity—Jury Question.** Nonexpert testimony tending, in a general way, to show that testator, at the time of the execution of his will, was aging rapidly, and was and for some time had been feeble, forgetful, childish, and somewhat oblivious of his surroundings, reviewed, and held insufficient to present a jury question on the issue of testamentary incapacity.

**WILLS: Testamentary Capacity—Evidence—Remote Feeble Condition.** Testimony tending to show the feeble and childish mental condition of a testator *long prior to the making of the will*, without any testimony tending to show progressive mental decay, is properly excluded, on the issue of testamentary capacity.

**WILLS: Requisites and Validity—Undue Influence—Advice and Counsel.** Testimony tending to show that the proponents of a will advised and counseled with testator as to the management and conduct of testator's affairs is admissible on the issue of undue influence; but such advice and counsel relative to a transaction *wholly disconnected with the execution of the will* (without any testimony that testator was mentally incapable of making a will) will not generate a jury question on the issue of undue influence.

**WILLS: Testamentary Capacity—Evidence—Harmless Error.** A contestant who fails to make a jury question as to the invalidity of the will may not complain that he was refused the right to contradict the recital of the will to the effect that he had received an advancement.

**WITNESSES: Competency — Transaction With Deceased — Denial of Fact.** A party to a will contest is incompetent to *deny* the recital of a will to the effect that he had received an advancement.

*Appeal from Allamakee District Court.*—W. J. SPRINGER, Judge.

### SEPTEMBER 19, 1922.

### REHEARING DENIED DECEMBER 15, 1922.

A WILL contest. The court directed a verdict for the pro-

ponents at the close of contestants' evidence, and the contestants appeal. The facts appear in the opinion.—*Affirmed.*

*William S. Hart* and *Stilwell & Stilwell,* for appellants.

*Mears & Lovejoy* and *Dayton & Eaton,* for appellees.

FAVILLE, J.—I.  All of the parties to this action are children of the testator, two sons, Fred and Paul, appearing as contestants, and a son, Gus, and a daughter, Martha Wallace, appearing as proponents.  The contest is predicated upon three grounds: (1) mental incapacity, (2) undue influence, and (3) fraud and conspiracy.  In a general way, two propositions are involved on this appeal.  Appellants contend: First, that, upon the evidence received upon the trial, the case should have gone to the jury.  Secondly, they contend that the court erred in rejecting certain testimony offered by contestants, and that, when said offered testimony is considered with that received, the contestants made a case for the jury.  This situation of necessity requires an examination of the evidence in the case, both as to that received and that which was rejected.

1. WILLS: testamentary capacity: jury question.

The testator, William Renne, came from Germany when a young man, and settled in Allamakee County.  He was a farmer.  He married, and had one son, the contestant Fred.  His wife died while Fred was an infant, and he remarried, and to this second marriage were born the three children Paul, Martha, and Gus.  Fred is 47 years of age, and the other three children range in ages from 39 to 44.  All are married.  What is known as the "home farm" of the testator consists of 150 acres.  The testator owned this farm for many years.  It appears that, sometime in 1900, Mr. Renne and his wife and the daughter, Martha, moved from the farm to the town of Waukon, where he continued to reside until his death.  After the others left the farm, Gus remained thereon, and operated the farm until 1904, when he left it, and Paul took possession, and continued to farm it thereafter as a tenant.  On August 19, 1911, the testator and his wife entered into a written contract for the sale of the 150-acre farm to Paul.  The contract provided that the 70 acres lying south of the road should be sold at $100 per acre, payable, $2,000 on March 1, 1915, and the balance on or before 6 years,

at 4 per cent, payable annually; and that the 80 acres north of
the road should be sold at $60 per acre, the purchase to go into
effect at the death of William and his wife; and that Paul should
pay a rental for this 80 during the life of each of said parties,
of $2.50 per acre per year. The testator's wife died in August,
1916, and the will in question was executed December 7, 1916.
By the terms of said will, the testator directs that the daughter,
Martha, shall be paid $4.00 per week for his board, washing, and
care, from the time of the death of his wife to the time of his
death. The will also recites that the said daughter, Martha, has
never received any advancements or wages, and bequeaths to her
the sum of $4,000, and also the house and lot in Waukon, in-
cluding furniture and fixtures. The will gives to the son Fred
Renne the sum of $200, and states, "My son Fred Renne having
received other advancements from time to time during my life-
time," and gives to the son Gus the sum of $4,000, and to Paul,
the sum of $5.00. The will also contains the following recital:

"My son Paul has received advancements during my life-
time and I have sold to him under contract, my farm in Lud-
low Township at a price much less than the actual value thereof,
said contract was procured by 'unfair means and by misrepre-
sentations causing me much trouble and worry, and therefore my
son Paul is not to share in the residue of my estate after the
other expenditures herein provided for."

The testator died May 2, 1919. In September, 1914, a suit
was brought in the name of William and his wife, to cancel the
contract which had previously been entered into with Paul for
the sale of the farm. The case was not disposed of until on or
about January 22, 1918, when it was decided in favor of Paul.
At the time of the testator's death, the estate consisted of $11,800
due from Paul on his contract for the purchase of the farm,
and indebtedness owed by Fred to his father of approximately
$250, and Liberty Bonds and War Savings Stamps amounting
to $140,—a total of approximately $12,190.

We must regard the testimony which was received in be-
half of the contestants, and also that which the contestants of-
fered, and which was rejected by the court, in the light most
favorable to the contestants, where the verdict in behalf of the
proponents was directed by the court at the close of contest-

ants' testimony. The case presents the not unusual situation where the old-time neighbors and friends of the testator are called as witnesses, and testify with regard to their acquaintance and familiarity with the testator and their observation of him. The record is not very definite in regard to the exact age of the testator, but we gather therefrom that, at the time of the execution of the will, he was about seventy years old. The wife of the testator died in August, 1916, and the evidence shows that the testator grieved greatly over her death, and that there was a marked change in his condition from that time on. There is testimony to the effect that he was despondent over the loss of his wife, and that he appeared to age and was more feeble physically thereafter. A neighbor who lived on the adjoining lot for seven months, during which time the will was executed, testified that he had one conversation with the testator during that time, in which the latter stated that he had no money with which to buy Liberty Bonds; that all he had was the old house; and that Paul gave him nothing for the farm. The conduct of the testator at the time of his wife's funeral was described by one of the witnesses, who said: "He acted kind of foolish there. He said, 'She is dead,' and began to cry." The witness testified that, after the death of testator's wife, he did not attempt to talk business with testator, and saw him but once, and that at that time he was sick in bed, and he did not try to talk business with him.

The contestant Paul testified that, after 1916, his father acted differently than he had before; that he noticed his "acting childish" before the will was made; that he first noticed it sometime in October, 1916. He says that his father appeared childish in the way he looked and what he said. At the time of the death of his wife, the testator said that the milk which the son Paul had brought to the house contained poison, and he wished it had been analyzed; and said this in the presence of the people that were gathered at the home. This witness also testified that he saw his father one time in October, 1916, and that his father did not appear to recognize him or to know him. The evidence of this witness discloses that, although the testator was a German and used that language readily, he could use and understand common, ordinary, short words of the English lan-

guage, and that, after the wife's death, witness noticed a differ-
ence in his father's ability to understand English, and that he
talked more in German. Witness testified that he heard a rela-
tive and friends talking with the old gentleman in German dur-
ing the wife's illness, and that he seemed feeble, and did not
seem to understand them. At the time of testator's wife's ill-
ness, one of the neighbor women put the bedding on the clothes
line, and told him to leave it there. However, he took it from
the line, and carried it into the house. The witness also testi-
fied that, on the day the will was drawn, which was also the
time when the testator's evidence was taken by deposition in
the case against Paul, the testator was feeble and childish. Much
of the deposition of the testator given at that time was incor-
porated into the record in this case, by cross-examination of the
witness. Both parties make claim that this deposition tends to
sustain their respective contentions. We have examined the
same with care. The testator stated therein that he had three
kinds of children, evidently referring to Fred, the son of his
first wife, to the son of his second wife by her former marriage,
and to the children of his second marriage. He displayed dif-
ficulty in naming his children in rotation. He said that the
road through his farm ran north and south, when it runs east
and west. He corrected this, when shown a plat, and when asked
the direct question if it had not run east and west.

Fred Renne testified that he first noticed something wrong
with his father in June or July, 1916; that he "acted childish,"
about that time, and could not explain himself as he used to.
After the wife's death, the witness noticed a change in the talk,
speech, and appearance of the testator; that he was feeble, and
grieved, and did not talk, and appeared to be broken down; and
that he did not see him down town very much after that; that
he was broken down and childish; that he acted differently than
he had before; that he did not seem to pay attention when talked
to, as he had before; that witness would see him go back and
forth to the graveyard, but did not get to talk to him; that he
walked about the house crying and talking to himself.

We have not attempted to detail all of the evidence that
was received on behalf of the contestants; but the foregoing, in
a general way, discloses the character and substance of the ma-

terial parts thereof. It is apparent therefrom that, at the time of the execution of the will, the testator was feeble physically, and that he had reached the condition that is described by some of the witnesses as being childish. He had suffered a great shock in the loss of his wife, and appears never to have recovered fully therefrom. He grieved over her loss, and doubtless suffered great mental depression because thereof. He was feeble.

We have examined the record with care in respect to all of the testimony that was received in behalf of the contestants, and we are convinced that it falls short of establishing either mental incapacity or undue influence or fraud and conspiracy such as would have justified the court in submitting the question to the jury or in permitting a verdict to stand, if one had been returned, in favor of the contestants. Time and again, in cases where the proof of mental incapacity or undue influence was greatly in excess of that admitted in evidence in the instant case, we have held that such proof was insufficient to sustain a verdict declaring the will to be invalid. In this case, no expert witness testified in regard to mental unsoundness. None of the nonexpert witnesses for the contestants were asked to or did express any opinion as to whether or not the testator was of unsound mind.

We have considered all of the testimony that was admitted in evidence, in the light most favorable to the appellants, and after a careful examination thereof, are satisfied that, upon the evidence so received, the court was justified in directing a verdict in favor of the proponents. Citation of authorities in cases of this kind is not of great value, because of the necessarily great difference in the record in the various cases. See, however, *In re Will of Byrne,* 186 Iowa 345; *In re Will of Kester,* 183 Iowa 1336; *Sevening v. Smith,* 153 Iowa 639; *Gates v. Cole,* 137 Iowa 613.

II. Appellants' main contention, however, is that the court erred in rejecting testimony offered by the contestants which, it is claimed, was material in its character, and, if admitted in evidence, would have been sufficient to have carried the case to the jury.

It is impossible for us, within the reasonable length of an opinion, to set out the very large number of questions to which

objections were made which were sustained by the court. The errors relied upon for reversal by the appellants are not specified in the argument in such a manner as to enable us to readily ascertain the specific rulings of which complaint is made, nor to easily determine the record in respect thereto.

Evidence was offered and rejected, both as to mental incapacity and undue influence. As to the first of these, the contestants sought to prove the feeble and childish mental condition of the testator at a time remote from the making of the will. There is no evidence, either admitted or offered, to the effect that the testator was affected with progressive mental decay.

2. WILLS: testamentary capacity: evidence: remote feeble condition.

He had the infirmities frequently incident to old age. He was feeble and childish, both before the making of the will and afterward. The testimony as to the exclusion of which complaint was made, referred to a condition remote from the time of the making of the will, and was offered without preliminary proof that, at the time of the execution of the instrument, the testator was mentally incompetent, or that he was afflicted with progressive mental decay. It was mainly cumulative.

Appellants strenuously contend that the court excluded important and material testimony in behalf of the appellants, tending to show fraud and conspiracy on the part of the proponents and Wallace, the husband of the proponent Martha, and also tending to show the exercise of undue influence in procuring the execution of the will. In connection with the testimony of the witness Fred Renne, after the court had sustained objections to specific questions that were asked, the following offer was made of record:

3. WILLS: requisites and validity: undue influence: advice and counsel.

"Contestants, with Contestant Fred Renne on stand, propose to prove by him, upon testimony which he is competent to give, following facts, as tending to support and constitute part of contestants' case upon undue influence; also upon mental incapacity; and also upon conspiracy: That this witness knew, for a considerable period of time prior to August, 1913, that William Renne had sold home farm to Paul Renne, and there was no dissatisfaction or objection on part of his father to such sale; and that, a short time prior to witness's trip to Waterloo,

Gus Renne, proponent, came to Waukon, and persuaded and represented to decedent that contract for sale of farm was fraudulent, and that he had been duped and swindled; and would receive nothing for farm; and that, at same time, or immediately before or shortly after, Gus had consulted, entirely on his own responsibility, and without knowledge of his father, an attorney at Waterloo, and it was arranged, at time in question, that he should procure Fred Renne to co-operate with them, and have decedent start proceedings against Paul to set aside sale of farm; and that, pursuant to such arrangement, Gus made an appointment with attorney at Waterloo, without knowledge of his father, and also arranged that his father and mother should accompany Fred to Waterloo, where old man and woman and Fred were taken to office of attorney at Waterloo; and that none of them knew anything of such arrangement; that Fred brought a nurse from his home to the home of his brother-in-law at Waterloo, which was the occasion of his visit, and, on arriving at the home of his brother Gus at Waterloo, left his father and mother there, and after usual greetings, announced that he was going to take nurse to brother-in-law's home on other side of city, and remain overnight, when he was told he should come back immediately after supper,—that Gus had made arrangements to take the father, mother, and Fred to see an attorney with reference to the sale of farm; that, pursuant to such request, Fred returned to Gus's residence that evening, and Fred and father and mother were taken by Gus to law office of Feely & Feely, where the consultation and conversation was had between Attorney Feely and decedent, in which Fred took no part, and statement was made by decedent that Fred, Charles, Gus, and Paul had all received advancements of equal amount; and that Gus, at that time, and as part of that conversation, stated to Feely and his father that that statement was correct, and that he had received just the same amount as each of the other three boys. We propose to follow up this testimony by other testimony that bringing of suit in question was entirely at procurement of Gus, Charles Wallace, and Martha Wallace, and that old man had nothing to do with it; also by proof in way of letters written by attorney procured and employed by Gus, Charles, and Martha Wallace to Paul Renne,

and to William S. Hart, that they had instigated the bringing of such suit upon ground that condition of old man was such at time of execution of contract that contract was not binding on him. Also that, until brought to Waterloo and to the office of Feely & Feely, William Renne was friendly to his son Paul and not dissatisfied with sale of farm.

"Offer objected to upon grounds that immaterial, irrelevant, incompetent, and because suit in relation to contract was remote and disconnected with making of will, and that what was said and done in relation thereto throws no light upon issue; and for further reason that, until there is some evidence showing or tending to show mental incapacity of testator, or show undue influence with reference to making of will, character of evidence offered is too remote and immaterial."

The objection was sustained.

Other evidence of a similar character on different phases of the general subject-matter covered by this offer was also offered by the contestants, and on objections thereto was rejected.

Two propositions confront us: (1) Was it error to sustain the objections to the offered testimony; and (2) if there was error in excluding any or all thereof, was it such error as requires a reversal of the case? We think that the trial court might well have permitted greater latitude in the introduction of contestants' evidence. The rulings indicate that it was the thought of the learned trial judge that contestants should first offer their evidence on the main question of mental incapacity, and that, until there was some substantial evidence offered tending to show mental incapacity, much of contestants' offered testimony was inadmissible. The order of the introduction of the evidence in the trial of a case is a matter peculiarly within the discretion of the trial court. Such discretion was not abused in the instant case. The excluded testimony was all submitted by proper offers. All the rights of the contestants were fully preserved in the record.

So far as the offered testimony tended to show mental incapacity on the part of the testator, even if it had been admitted in evidence and added to the testimony which was received, the contestants would still have failed to make a sufficient showing

of mental incapacity to have warranted the court in submitting that question to the jury, or to have permitted a verdict predicated thereon to stand; so that, so far as proof of mental incapacity is concerned, the rejection of the additional testimony sought to be introduced in evidence by the appellants was without prejudice. *In re Will of Kester,* supra; *Fothergill v. Fothergill,* 129 Iowa 93; *Speer v. Speer,* 146 Iowa 6.

The greater part of the rejected testimony has to do with the question of undue influence and of alleged fraud and conspiracy. Briefly stated, not only by the offer above quoted, but by other offers, and by the examination of witnesses, the contestants sought to show the details of transactions between the testator and the proponents, Gus and Martha, in respect particularly to the suit against Paul for the cancellation of the contract for the sale of the farm.

In cases of this kind, where mental incapacity and undue influence are alleged, a wide latitude is allowed in the introduction of testimony bearing upon either question.

Considering all the rejected testimony in regard to the transactions between the proponents and the testator, in regard to the sale of the land to Paul and the subsequent suit for the cancellation of the contract, we do not think this evidence was sufficient to show undue influence in the making of the will, or to have taken that question to the jury. The evidence in regard to these various transactions might very properly have been received in evidence by the court, but we are still confronted with the question as to whether or not, if such evidence had been received as offered by the contestants, it would still have made a case sufficient to go to the jury. The two children Gus and Martha had a legal right to counsel and advise the testator in respect to the contract for the sale of the farm to Paul, and in regard to the bringing of the suit to set the same aside. The test of undue influence in a will contest is the question of whether or not, at the time the will was drawn, the mind of the testator was overcome by the influence of some other person, so that the will and wish of some other person were substituted for that of the testator. As before stated, a wide latitude is allowed in the admission of evidence in cases of this kind, for the purpose of showing the relations between the parties, their

acts and conduct, and their disposition, desire, and opportunity
to exercise undue influence. Much of the evidence offered by
the contestants along this line could properly have been re-
ceived. It is, however, all made a part of the record by the
offers to prove; and the question we must determine is whether
or not, considering this offered testimony in the light most
favorable to the appellants, it made a case to go to the jury
on the question of undue influence. If it did, the case should
be reversed. If it did not, then the rejection of the offered testi-
mony was without prejudice to the appellants. Even if it be
true that the appellees counseled with and advised the testator
with regard to the bringing of the suit for the cancellation of
the contract with Paul, and that the various things took place
in connection therewith which the contestants offered to prove,
this would not, we think, make a case sufficient to go to the jury
on the question of undue influence in the making of the will.
As we have already indicated, the evidence was insufficient to
support a finding that the testator was mentally incapable to
make the will. There is no proof that either of the appellees
was present at the time the will was drawn, or that they so-
licited, advised, or counseled the making of the will, or that they
had any knowledge of the execution of the same at or about the
time it was executed. The will was signed at the time the testa-
tor gave his deposition in the case against Paul. The fact that
the appellees had been instrumental in advising the testator, in
regard to the suit against Paul, to cancel the contract for the
sale of the land, if fully established, as claimed by the appel-
lants, would not be sufficient to warrant the inference that the
appellees exercised undue influence over the testator, and im-
properly persuaded him to execute the will in question. The of-
fered testimony of this character, giving it the full weight to
which it is entitled, would have been, if received, insufficient
to justify the court in submitting to the jury the question of
undue influence; and therefore the court did not err in reject-
ing it.

III. The will recited that the son Fred had received ad-

vancements, from time to time, during the lifetime of the testator. It was sought to prove by Fred that this recital in the will was untrue; that he had not received such advancements.

**4. WILLS: testamentary capacity: evidence: harmless error.**

There was no error in the rejection of this testimony. Without a sufficient showing of mental incapacity or undue influence to take the case to the jury, it was immaterial whether Fred had received the advancements or not. But, in any event, the son Fred was an incompetent witness to testify in denial of the receipt of such advancements from the testator, under Code Section 4604.

**5. WITNESSES: competency: transaction with deceased: denial of fact.**

"A witness testifies 'in regard to a personal transaction' no less when he denies it than when he affirms it." *In re Will of Winslow,* 146 Iowa 67, and cases cited.

IV. Contestants sought to prove by Witnesses Ludeking and Opfer that, at a time after the will was executed, a proposition of settlement of the land transaction with Paul was under consideration, in which Paul had expressed a willingness to pay the full amount of the purchase price of the land in cash; that, on the day of the proposed settlement, the testator was accompanied by the proponent Gus, and by Charles Wallace, the husband of the proponent Martha; and that he motioned to the witness and shook his head, and afterward told him that someone had telephoned for Gus, and that Gus, Charles, and Martha would not let him settle with Paul; and that he seemed sorry; and that at that time he was weak, feeble, and childish. Also, in this connection, contestants offered to prove that Opfer had a talk with Charles Wallace, the husband of Martha, in which the latter said that "they would not let the old man make the settlement; that he was crazy."

It is strenuously insisted that this evidence was admissible. Even if admissible, it was insufficient, together with all the other testimony received, as well as that offered, to carry the case to a jury.

V. Appellants sought to show that Fred was the favorite son of the testator; that the recitals in the will regarding advancements to Paul were not correct; that, at the time of the giving of his deposition, the old gentleman was taken from the

room, and consulted with Gus; that the decedent, after making the will, deeded the homestead to Martha, and in the following May, deeded 18 acres of other lands to Charles Wallace, for a recited consideration of $450; and other matters, all of which offers were rejected by the court.

We have not attempted to set out or review all of the testimony that was offered, and to which objections were sustained. Some of the offered evidence should have been received in evidence, and appellees' objections should have been overruled. We have, however, considered all of this testimony as though it were in the record, and in the light most favorable to the appellants. If all of the offered evidence which was properly admissible had been received by the court, we are still forced to the conclusion that it would not, when taken in connection with that which was received, have made a case to go to the jury upon the question of either mental incapacity, undue influence, or conspiracy and fraud. We cannot reverse because of a failure to receive evidence of this kind when, even if received, it would be insufficient, when considered with all of the other evidence in the case, to carry the case to the jury.

A careful examination of the whole record, both of the testimony which was received and that which was rejected, satisfies us that the evidence produced by the contestants upon the trial of the case, taken as a whole, was insufficient to establish mental incapacity, undue influence, or fraud and conspiracy, in the execution of the will.

It therefore follows that the judgment appealed from must be, and it is,—*Affirmed.*

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.