IN RE ESTATE OF JAMES SHIELDS.

CLARENCE S. SHIELDS, Appellant, v. SADIE HANSON, Appellee.

**WILLS:** **Undue Influence—Evidence—Jury Question.** Evidence held
1  insufficient to generate a jury question on the issue of undue influ-
ence in the execution of a will.

**WILLS:** **Mental Competency—Evidence Insufficient to Generate Jury**
2  **Question.** Testimony tending to show mere old age or some de-
terioration in physical or mental powers, or peevishness, childish-
ness, and eccentricities, is not, in and of itself, sufficient to generate
a jury question on the issue of the mental unsoundness of a testator.

*Appeal from Wapello District Court.*—C. W. VERMILION, Judge.

OCTOBER 17, 1924.

A WILL contest. The trial court directed a verdict for the
proponent, and the contestant appeals.—*Affirmed.*

*Ernest R. Mitchell* and *Jaques, Tisdale & Jaques,* for ap-
pellant.

*John W. Lewis, Merrill C. Gilmore,* and *J. J. Smith,* for
appellee.

FAVILLE, J.—I. The case presents the not unusual situ-
ation of a contest between the children of a testator over the
admission of a will to probate. The contest is predicated upon
the two grounds of alleged mental incapacity and undue in-
fluence.

The testator, James Shields, was a farmer. He died No-
vember 15, 1921, at the age of 71 years. He left surviving him
two children, a daughter, Sadie Hanson, the proponent, and a
son, Clarence S. Shields, the contestant. The testator had been
a widower for more than twelve years prior to his death. He
had twice married. His second wife was a widow, with four

children, three of whom are living and married, and one of whom is deceased, leaving a son, David Houke, who is a beneficiary under the will. The proponent is married, and at the time of the trial was 37 years of age. The contestant is unmarried, and was 42 years old at the time of the trial. The will was executed August 23, 1921. By the terms of the will, the testator gave to the contestant, Clarence S. Shields, an annuity of $500, to be paid to him on the first day of December, each year, and the same was to be a charge and lien upon the estate. Two stepgrandsons were each given $250. The remaining portion of the estate, by the terms of the will, was devised and bequeathed to the proponent, Sadie Hanson.

The estate consisted of personal property of the value of about $7,000, and approximately 400 acres of land. There is a conflict in the evidence as to the value of the real estate. It appears that different tracts vary in quality, about 340 acres being variously estimated at from $110 to $175 per acre, and about 54 or 56 acres being valued at from $50 to $60 per acre.

We consider first the matter of undue influence. The proponent was married about 1910. Prior to the marriage, her husband had been employed by the testator, and had lived on the farm with the family. After the marriage, the proponent and her husband continued to occupy the farm for about five years. They then rented another farm, but returned to the "home place" some time in the fall of 1918 or the spring of 1919, and have since resided there.

1. WILLS: undue influence: evidence: jury question.

It appears that, on the 30th day of December, 1919, the testator made a will. This will was drawn by an attorney who had been the legal adviser of the testator for a number of years. No one was present at the time this first will was drawn, except the testator and the attorney. The will in question was drawn by the same attorney on the 23d day of August, 1921. The only difference between the terms of the two wills is that, in the will of December, 1919, the stepgrandson David Houke was bequeathed $1,000, and in the will of 1921, this bequest was reduced to $250, and an additional bequest of $250 was given to the stepgrandson Merrill McCarty.

Regarding the execution of the will in suit, it appears without conflict in the evidence that the testator went alone to the office of his attorney who had drawn his former will, and explained to him that he desired to modify his former will and reduce the amount he had given to the stepgrandson David, to $250, and to make a like bequest to the stepgrandson Merrill McCarty. In reply to an inquiry from the attorney, he stated that the first will was in a safety box in the bank, and upon a suggestion from the attorney, he went to the bank and secured the will and returned with it to his attorney. The will was copied by the stenographer of the attorney, except the paragraph in respect to the two bequests to the stepgrandsons. The testator went to the store of a friend, and informed him that he was making his will at the attorney's office, and asked him if he was willing to witness the signature. Upon being informed that the party would so witness it, the testator left, and later returned, and told the witness that he was ready to sign the will. Thereupon, the witness accompanied him to the attorney's office, and the will was signed and duly witnessed. The attorney placed both the wills in an envelope, which was duly indorsed by him and given to the testator, who took it to the bank and deposited it in a safety deposit box, where it was found after his death.

There is no evidence that the proponent or anyone associated closely with her had any knowledge of the execution of the will or that any will had been made. Evidence was offered in behalf of the contestant for the purpose of endeavoring to show that the proponent exercised a dominating influence over the testator during the time she was living at his home, and at or about the time of the execution of the will; but a careful examination of the record satisfies us that the evidence in regard to said matter is so lacking in any probative value whatever as to utterly fail to support any claim of undue influence on the part of any person in procuring the execution of the will. There was no such showing of fact in regard to this subject-matter as to raise any question that would warrant the court in submitting the issue of undue influence to the jury.

II. The vital question in the case centers about the claim

of mental incapacity on the part of the testator to make the will. As is usual in such cases, the evidence covered a very wide range of territory, and it would be impossible for us, within the reasonable lengths of an opinion, to review the evidence of the witnesses for the contestant and the proponent in respect to the acts, conduct, and declarations of the testator during the latter years of his life. Something like forty witnesses testified more or less directly on this subject in behalf of the contestant, and something over twenty in behalf of the proponent.

2. WILLS: mental competency: evidence insufficient to generate jury question.

It appears that the testator was a thrifty, hard-working, and economical farmer. It is quite apparent from the testimony that the contestant had been a disappointment to his father. He had worked upon the home farm for some time, and then had traveled in the west. It appears that he was somewhat addicted to the use of intoxicating liquors, and that he was given to gambling, and had been at one time a partner in the operation of a gambling house. At the time the first will was drawn, in 1919, the testator explained to his attorney that, because of the habits of the contestant, he wished to make provision for him in the way of an annual income, which, after consultation with the attorney, it was decided should be done in the manner set forth in the will.

It is to be noticed that the last will was drawn about three months prior to the death of the testator. There is evidence that the testator had had a spell of sickness, and had been confined in the hospital. He had attained the age of seventy-one years. There is evidence tending to show that he had arteriosclerosis and a high blood pressure. The contestant offered one medical expert as a witness, who testified generally in response to hypothetical questions regarding arteriosclerosis and senile dementia, but who testified, on cross-examination, that, at the time of his examination of the testator, in 1920, he did not see anything wrong with the testator's mind; that testator seemed to understand what he was talking about, was rational, and his memory seemed good. He testified that, when he examined the testator at his home, shortly before his death, he gave him "a

pretty thorough examination,'' and saw nothing wrong with his mind; that testator seemed to be intelligent, and answered rationally all questions put to him; and that at no time did witness notice anything out of normal in his mental state. He also said:

''A man might have senile dementia in some of its forms and yet be capable of doing business, understand all about his financial affairs, and know what he wanted to do with his property.''

In addition to the medical testimony, other witnesses for the contestant testified in regard to observations of the testator and to various conversations with him and transactions on the part of the decedent which had come under their notice. This evidence must be construed in the light most favorable to appellant, in view of the ruling of the trial court in directing a verdict; and, regarded in this light, the evidence shows the general picture of an old gentleman who, through thrift, industry, and economy, had accumulated a substantial property. He was a man of activity. He was at times irritable and childish in some ways, and forgetful. His daughter, the proponent, had not always by word and deed evidenced the most complete filial consideration for him; but she and her husband had lived with him and had cared for him during his declining years. Unquestionably, the contestant had been a disappointment to the father, who, however, with a natural and commendable feeling, did not desire to cut him off from all participation in his estate.

There are some inconsistencies in the record. The will describes the proponent as Sadie Hansel, instead of Sadie Hanson; but this inaccuracy is, we think, fully explained, and in no way the fault of the testator.

The inequality of the distribution of the estate, when taken in connection with all of the other evidence in the case, was not a sufficient circumstance to carry the case to the jury.

No useful purpose would be served by our setting out in detail the evidence of the various witnesses as to the matters of one kind or another that had come under their observation. We have examined the record with care; and, giving to the testimony in behalf of the contestant every consideration it is en-

titled to under such a situation as is presented here, we reach the conclusion that it did not offer a case for the consideration of the jury, and that the trial court would not have been justified in permitting a verdict in behalf of the contestant to stand. Time and again this court has declared that mere old age or some deterioration in physical or mental powers, or peevishness, childishness, and eccentricities, are not alone sufficient to carry to a jury the question of mental unsoundness on the part of a testator. The final question in such a situation as is presented to us is whether or not there is sufficient evidence offered in behalf of the contestant to take to the jury the question of whether or not the testator was so lacking in mental capacity at the time of the execution of the will as to be unable to intelligently know the property which he possessed and the natural objects of his bounty and to intelligently exercise judgment and discretion in the disposition of the same. When measured by such a standard, the evidence in behalf of the contestant is so utterly lacking in this respect that it did not present a matter for the consideration of the jury. Actions of this kind must of necessity be determined by the evidence offered in the particular case; but, in general, as bearing upon the conclusions herein and the reasons therefor, see *Perkins v. Perkins,* 116 Iowa 253; *Gates v. Cole,* 137 Iowa 613; *Leonard v. Shane,* 182 Iowa 1134; *In re Will of Kester,* 183 Iowa 1336; *In re Will of Byrne,* 186 Iowa 345; *Kerkhoff v. Monkemeier,* 188 Iowa 103; *In re Will of Renne,* 194 Iowa 938; *Seamans v. Gallup,* 195 Iowa 540.

We do not deem it necessary to prolong the discussion. From a consideration of the evidence in the case, and giving it the full weight to which it is entitled under the circumstances herein presented, we are of the opinion that the trial court did not err in sustaining the proponent's motion for a directed verdict in her behalf; and the judgment appealed from is, therefore,—*Affirmed.*

ARTHUR, C. J., and EVANS and PRESTON, JJ., concur.